## SOUTHLAND MOBILE HOME CORPORATION
### v. ROBERT L. CHYRCHEL AND GLORIA A. CHYRCHEL

73-102                                      500 S.W. 2d 778

Opinion delivered October 29, 1973

*Paul Jackson,* for appellant.

*Lewis E. Epley Jr.,* for appellees.

CARLETON HARRIS, Chief Justice. Appellant, Southland Mobile Home Corporation, operated, through O.E. Barham,[1] a mobile home sales lot near Springdale. In January, 1970, appellee, Gloria Chyrchel,[2] visited the

[1] This employment, according to Barham, was terminated in September, 1970. Bob Wallace, General Manager and Vice President of Southland, testified that Barham was employed until September, 1971, but this appears to be a mistake.

[2] While Mr. Chyrchel is also an appellee, he does not appear actively in the case and appellees will be referred to throughout this opinion in the singular.

Southland Mobile Home lot in Springdale and talked to Mrs. O. E. Barham, wife of Barham, relative to purchasing trailers. At the lot, appellee looked at two mobile homes, known as a "Detroiter", and a "Nashua", which she subsequently purchased, but she also expressed a desire to purchase a mobile home which had an end bedroom. According to appellee, Mrs. Barham said there was not one on the lot but she knew where one of this type was located, and they drove to the location and looked at it. Mrs. Chyrchel was pleased with the trailer (an LTD) shown her, and when it was agreed that a new gas range would be placed in it, she said she would purchase same. All three trailers were purchased by appellee, a down payment in a lump sum of $2,000 being made ($500.00 of which was a deposit on the LTD) and the balance being made by three different checks before the occurrence of the fire, hereinafter discussed.[3] After the purchases had been made, the service crew, employed by Southland, made the installations. Though employed by Southland, they were hired by Barham and worked directly under him. The LTD trailer was placed in position, the sewer and gas were hooked up, and the pilot light on the range lighted, but the service crew was unable to complete installation because they were not knowledgeable on how to hook up the furnace, and they did not hook up the electricity. While they were engaged in their work, Mrs. Chyrchel told them that she smelled gas, suggested that there was possibly a leak, and asked them to check it. She was advised that they had already checked for leaks, but to satisfy her, would check again. This partial installation occurred on Tuesday, April 7. On Friday, the 10th, they connected the water heater but still did not complete the other connections. On this same day, Mrs. Chyrchel thought she could still smell gas but, noticing a piece of pipe on the living room floor, assumed that there was a residue. She opened the windows to "air" the trailer, returned Sunday morning because it appeared that there would be a rain, closed the windows, and left. Not long thereafter, there was a report that the LTD was on fire.

[3]The Nashua, a used trailer, was purchased for the use of Mrs. Chyrchel, who lived in another state, but planned on moving to Carroll County to live with her husband, after retirement; the LTD was purchased for the use of her mother; and the Detroiter, a new trailer, was purchased on behalf of friends who were going to live in it.

There had been an explosion[4], and the trailer was damaged extensively and made uninhabitable as a result of the fire. When Mrs. Chyrchel was unsuccessful in getting her money refunded or obtaining a replacement for the LTD, she instituted suit against Southland and Barham, alleging negligence, and subsequently amending the complaint to allege breach of contract and breach of warranty. Southland defended on the basis that the trailer was sold to appellee by Mr. Barham, on his own, and that Southland had no interest in the trailer, and did not make the sale; further, that the title to the LTD, at the time of the fire, was in appellee, and it was not liable. On trial, the court held that there had been a breach of contract and a breach of warranty by Southland and Barham, jointly and severally, and rendered judgment in favor of appellee in the sum of $4,595, together with interest at the rate of 6% per annum. From this judgment, appellant brings this appeal.

For reversal, three points are relied upon, first that Southland did not own the LTD, and therefore could make no sale (and accordingly no warranty); second, that the sale was complete, and the risk of loss passed to the buyer at the time of the fire. Finally, it is asserted that the Barhams were not the agents of Southland at the time of the sale of the LTD, and the company is not bound by their actions. For convenience, these points will be discussed in reverse order.

The trial court pointed out some rather pertinent facts in rendering its opinion as follows:

"But now, as far as the cause of action on the breach of warranty or breach of contract, I think the case right now shows that a prima facie case[5] on a cause of action on a breach of warranty in this sense, that the trailer was purchased by Mrs. Chyrchel from the Barham's who were held out to be the agents in charge

[4]According to Barham's testimony, the fire apparently started around the gas stove.

[5] This portion of the opinion was rendered in response to appellant's motion for directed verdict, such motion being denied. Thereafter, only Wallace testified, and the court, after further brief comments, in accord with those quoted, rendered judgment.

of the lot, or Mr. Barham was the agent in charge of the Southland Mobile Home Corporation lot at Springdale. *** It is also true that when the trailer was delivered, it was delivered by Southland Mobile Home truck, by Southland Mobile Home service personnel, and they proceeded to make the installation. I don't think it's seriously argued that when she went to see about buying the trailer, she went to the Southland Mobile Home office and she was taken by Mrs. Barham to the Southland Mobile Home lot where they kept their trailers and everything involved in this transaction is calculated to indicate that Mr. Barham was the agent of the Southland Mobile Home Corporation and that he was doing those things which were normal and within the scope of his authority as such, and he at least had ostensible authority to sell the trailers to her on behalf of Southland Mobile Homes. Now as far as whether Southland Mobile Homes actually owned the trailer or not, I think the evidence shows they probably did not, but it also shows that at the time Mrs. Chyrchel bought the trailer that she was not told that it was owned by anybody other than Southland and that she was told that it was on a different lot and that Mr. Barham would have to get it to her, and that is what he apparently did. Now I think she was entitled to consider that she was dealing with Mr. Barham as the agent of Southland Mobile Homes, because the whole transaction appeared to be that way, and on that basis I think up to this point Southland is in the position of a seller and as such is chargeable like any other seller with the matter of implied warranties of a sale and warranty of merchantability for the purpose indicated, and the testimony by Mrs. Chyrchel is she told Mr. Barham she wanted it for a home for her mother, and this is what it was to be used for."

Bob Wallace, General Manager of Southland, admitted that Barham was an employee of the company, in charge of the Springdale lot, and was, of course, authorized to make sales. Wallace testified that Barham was the only salesman to whom the company paid any commissions, and that other salesmen were paid by Barham. In other

words, commissions paid for sales made there were all sent to Barham who, if others had made a sale, paid them from the check sent him. Wallace said it was left up to Barham whether he wanted one salesman or fifty. The witness stated that Barham had no authority to purchase trailers.

Appellant depends in large measure upon the fact that, in paying for these trailers, appellee, in purchasing the Detroiter and Nashua, made the checks payable to Southland, but in purchasing the LTD, made the check payable to Barham. It is accordingly argued that she knew that Southland did not own the LTD. We do not think this fact deserves the significance attached to it by appellant, for Mrs. Chyrchel testified that she was told to make the check payable to Barham instead of Southland because this particular trailer was not on the Southland lot at the time it was purchased.

As pointed out by the trial court, the setting up of all trailers and installation of services were performed by Southland employees. The trailers were taken to Mrs. Chyrchel's premises by appellant's crew and appellee testified that the Southland name was on the towing vehicle. Though the trailers were shown to Mrs. Chyrchel by Mrs. Barham, there is no question but that Barham himself participated in the sale. He was "in and out" of the office while the papers were being prepared, and was thoroughly familiar with the transaction, including the fact that he told Mrs. Chyrchel to make out one of the checks to him.

Barham testified that all service personnel were employed by Southland, though he, as manager, hired them. According to the witness, he had the responsibility of hiring and firing for Southland, and these employees worked under his direction. The delivery equipment was owned by Southland, and he said that it was this equipment that delivered the trailers that Mrs. Chyrchel had purchased. Barham testified that his wife worked for him in sales and was working as his assistant at the time. Other pertinent facts worthy of mention are that the contracts for the purchase of all three mobile homes were prepared at the same time by Mrs. Barham in the office of

appellant, using forms furnished by appellant. As previously stated, the kitchen range in the LTD was to be replaced and Mr. Barham testified that the new range came from the inventory of appellant and was installed by its service personnel at his direction. There is no dispute in the evidence but that Mrs. Chyrchel was not told that the mobile home was owned by someone other than Southland. In *General Motors Acceptance Corporation v. Salter,* 172 Ark. 691, 290 S.W. 584, this court, quoting 2 C.J. 573, said:

> " 'Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume, or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.' "

We have also said that when the evidence as to the nature and extent of an agent's authority is in conflict, it is a question of fact for the jury. See *American Metal Window Company v. Watson,* 238 Ark. 418, 382 S.W. 2d 576.

In *Mark v. Maberry,* 222 Ark. 357, 260 S.W. 2d 455, this court stated that while an agent's declarations, standing alone, are not admissible to prove agency, nevertheless an agency can be established by circumstances, and any evidence tending to establish agency is admissible, including the testimony of the agent. We hold that there was substantial evidence to support the trial court's finding, sitting as a jury, that Mr. Barham possessed apparent authority to sell the LTD as the agent of appellant company.

Nor do we agree that the sale was complete before the fire and the risk of the loss had passed to the buyer. Mrs. Chyrchel testified that the price included installation of facilities and that everything was to be ready for use of the trailer by her mother before acceptance. In fact, she said that her son had signed the acceptance agreement for the other two trailers, but that this particular

trailer was never accepted nor was any check list ever presented to her for acceptance. Barham testified that, "We would try our best to get the trailer ready, yes," and he explained that by "ready", he meant water, lights, and gas connected so that the trailer could be lived in. Admittedly, this was not done, and the trailer was not ready for occupancy at the time it burned. Appellant relies on Ark. Stat. Ann. § 85-2-509 (3) (Add. 1961), which it contends placed the risk of loss on appellee once the trailer was delivered. It would appear that there is a quick answer to this contention. Sub-section (4) provides that the provisions of this section are subject to a contrary agreement of the parties and to the provisions of the article on effect of breach on risk of loss as stated in § 85-2-510. We have already pointed out that in addition to moving the trailer to the Chyrchel lot, there was an agreement to hook up the facilities and thus prepare the trailer for occupancy by Mrs. Chyrchel's mother. This required more from appellant than mere placement of the trailer and can be construed as a contrary agreement which left the risk of loss on the seller/appellant until the installation was completed. Also, § 85-2-510 provides that where delivery of goods so fails to conform to the contract as to give the right of rejection, the risk of loss remains on the seller until cure or acceptance. This section was construed in the case of *William F. Wilke, Inc.* v. *Cummins Diesel Engines, Inc.*, 252 Md. 611, 250 A. 2d 886, where a seller delivered a generator to the job site in a field, but did not perform required field tests called for under the agreement between the buyer and seller. Subsequently, the generator froze, and the question at issue was which party suffered the loss. The court held that "In the absence of a delivery of conforming goods, the risk of damage remained with Cummins, notwithstanding the delivery of the generator to the job site, the receipt of payment from Wilke, and some eight months' delay in start-up." It also stated, "U.C.C. § 2-106 (2) provides that 'Goods or conduct including any part of a performance are "conforming" or conform to the contract when they are in accordance with the obligations under the contract.' Non-conformity cannot be viewed as a question of the quantity and quality of goods alone, but of the performance of the totality of

the seller's contractual undertaking. *Campbell* v. *Pollack,* 101 R.I. 223, 221 A. 2d 615 (1966)." The court then said:

"Under the facts of this case, we have no difficulty in holding that the delivery of the generator to the job site, while identifying the goods to the contract, did not amount to a delivery of goods or the performance of obligations conforming to the contract. It could not constitute such a delivery and performance until the generator had been installed, started up, and field tests completed to the satisfaction of the government. Until then, risk of loss remained with Cummins regardless of where title may have stood."

Previous discussion has included Southland's contention that it did not own the LTD and therefore could make no sale, this contention having been found to be without merit.

We are of the view that the evidence, heretofore set out, is of a substantial nature, and in *American Metal Window Company* v. *Watson, supra,* we commented that it is well settled law in this state that the finding of the trial court, as a trier of the facts, has the verity and binding effect of a jury verdict and will be sustained if there is any substantial evidence to support it.

Affirmed.