**RALSTON PURINA COMPANY, a corporation, Appellant,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, a corporation, Appellee.**

No. 75–1536.

United States Court of Appeals, Eighth Circuit.

Submitted March 8, 1976.

Decided Aug. 9, 1976.

Rehearing and Rehearing En Banc Denied Aug. 31, 1976.

As Amended Sept. 29, 1976.

Rehearing and Rehearing En Banc Denied Oct. 27, 1976.

Stephen C. Murphy, St. Louis, Mo., for appellant; Frederick H. Mayer, of Cook, Murphy, Lance & Mayer, St. Louis, Mo., on brief.

Joseph M. Kortenhof, of Kortenhof & Ely, St. Louis, Mo., for appellee.

Before GIBSON, Chief Judge, and HEANEY and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

Ralston Purina Company (Purina) brought this action in the District Court to recover proceeds under two liability insurance policies issued by Hartford Accident and Indemnity Company (Hartford). Purina's alleged liability arose when certain flocks of chickens it sold to a third party were found to be contaminated by defective feed which Purina had produced. The District Court, sitting without a jury, entered judgment in favor of Hartford, and Purina appeals.

The basic facts are undisputed:

On January 19, 1972, Purina entered into an agreement with Charles Auger, a former Purina employee, to sell Auger the assets of Purina's poultry production operation in Waterville, Maine. The sale agreement provided that Auger was to lease the real property at the operation from Purina and that the assets to be sold included certain broiler chicken flocks owned by Purina on February 5, 1972.[1] These flocks had been placed under contract with independent growers for feeding until proper maturity.

The sale agreement also provided that Auger would assume managerial control over the relevant assets on February 5, 1972, and that operations after that date would be for his account. The agreement stated, however, that legal title to the assets would not be transferred prior to the date of closing, March 31, 1972. The agreement and the obligations of the parties were subject to the following condition:

[T]here shall have been no loss to the PURINA Assets by fire, flood, accident, other calamity, seizure, forfeiture or termination of such a character as to interfere materially with the continuous operation of the business covered by this Agreement or which materially decreases the value of the PURINA Assets or which in the reasonable judgment of BUYER materially affects PURINA'S Operation, whether or not the loss occasioned by such occurrence is covered by insurance.

In the event of such loss, Auger was given the option in Section 4 of the agreement to either:

A. elect to proceed with the purchase, in which event there shall be an abatement of the purchase price in an amount mutually agreeable to it and PURINA; or

B. elect to terminate this Agreement by giving 10 days notice of such termination to PURINA.

Finally, the agreement provided that the risk of loss or damage to the Purina assets by fire or other casualty would be borne by Purina until the closing date and that Purina would indemnify and hold Auger harmless for any "losses, damages or deficiencies resulting from any misrepresentations, breach of warranty or nonperformance of any agreement on the part of Purina".

Later in January, 1972, feed manufactured by Purina at its Thorndike, Maine, operation became contaminated with polychlorinated biphenyl (PCB). This feed was distributed to the independent contract chicken growers by Purina. Federal regulations prohibit the commercial sale of chickens with PCB contamination above certain levels, and excessively contaminated chickens are usually destroyed to prevent further investment and loss. On January 27 and thereafter, some of the chicken flocks at the Waterville operation were fed PCB contaminated feed. On February 5, Auger took possession of the Waterville operation, including the chicken flocks. No physical movement of the sale assets was required for delivery of possession to Auger. Two days later, an abnormally high

---

1. The other assets included in the sale were (1) leasehold improvements owned by Purina at Thorndike, Maine, on February 5, 1972; (2) motor vehicles located at the Waterville operation; (3) certain accounts receivable of the Waterville operation; and (4) the Waterville inventory on February 5, 1972.

mortality rate was observed in the flocks. Following an investigation by Purina scientists, it was determined that PCB was present in the chickens. The chickens found to be within acceptable federal PCB limitations were processed and sold, but approximately 300,000 chickens had to be destroyed.

Between February 7 and March 29, Purina and Auger negotiated with respect to the PCB damage. They agreed that the closing would not be a release of Auger's claim or alter any of the rights or responsibilities of the parties with respect to the loss. Auger decided not to pursue either of the two remedy options available to him under Section 4 of the agreement and continued to make his installment payments. Purina acknowledged its liability to Auger for this damage. Following closing, Purina settled the PCB damage claim for $385,000, an amount which the District Court found and the parties agree to be a reasonable settlement amount. Hartford had been fully informed of the settlement negotiations but declined to participate, contending that its policies did not cover this liability.

The general liability policy issued by Hartford to Purina provided in relevant part that Hartford would pay on behalf of Purina "all sums which [Purina] shall become legally obligated to pay as damages, including liability assumed under an insured contract because of * * * Property Damage Liability * * *." "Property damage" was defined as "injury to or destruction of tangible property." The general liability policy excluded from coverage property damage to "property owned * * by * * * the insured" as well as property damage to "the named insured's products arising out of such products".

The "bumbershoot policy", which provided excess insurance over the policy limits of the underlying general liability policy, stated that Hartford would indemnify Purina for the loss in excess of the general policy limits "arising out of [Purina's] legal liability (whether imposed by law or assumed under contract[)] for damages, direct or consequential, because of personal injury or property damage."

After Hartford refused to pay Purina the settlement amount, Purina brought this action in the District Court based on diversity jurisdiction.[2] The District Court held that there was no coverage of Purina's liability to Auger under the policies because, in its view of the provisions of the Uniform Commercial Code and the terms of the sale agreement, Purina was not liable to Auger for money damages caused by the ingestion of the contaminated feed.

The District Court concluded (1) that Auger's acceptance of the damaged sale assets obligated him to pay the full purchase price; (2) that such acceptance relieved Purina of any liability to pay money damages on account of the loss of the chickens; and (3) that since the settlement was collateral to the sale agreement and after the damage had occurred, it was not covered under the "assumed under contract" provisions of the bumbershoot liability policy. We respectfully disagree. While the conclusion of the syllogism is persuasive, we think it proceeds from a faulty premise derived both from an erroneous interpretation of the sale agreement[3] and an erroneous application of the Uniform Commercial Code.[4]

We agree with the District Court that Auger's decision to go forward with

---

2. Purina is a Missouri corporation with its principal place of business in Missouri; Hartford is a Connecticut corporation with its principal place of business in Connecticut; and the amount in controversy exceeds $10,000. Jurisdiction is proper under 28 U.S.C. § 1332.

3. The clearly erroneous standard of Fed.R. Civ.P. 52(a) does not apply to appellate review of a contract issue resting upon the construction of written documents, and we must reach

an independent judgment as to the meaning of the contract. *See Teamsters, Local No. 688 v. Crown Cork & Seal Co.*, 488 F.2d 738, 740 (8th Cir. 1973); *Motor Carriers Council v. Local Union No. 600*, 486 F.2d 650, 653 (8th Cir. 1973); *Dingman v. United States*, 429 F.2d 70, 72 (8th Cir. 1970).

4. The District Court properly held that the Uniform Commercial Code was applicable to this case. It has been adopted without material

the closing on February 5 constituted an "acceptance" of the goods within the meaning of U.C.C. § 2–606. While Auger did not know the full extent of the damage to the chickens, he was aware of the problem and had acquiesced in the destruction of at least some of them. Our disagreement with the District Court is over the effect of such acceptance.

Section 4 of the sale agreement placed management of the assets in the hands of the buyer but deferred transfer of legal title until the closing date. During this period, Purina retained the risk of loss. Section 4 provided further that in the event of a material loss, as therein defined, Auger "may either" elect to proceed with the purchase under an abatement of the purchase price or elect to terminate the agreement. The District Court assumed, and Hartford argues on appeal, that the agreement thus limited Auger to two choices of remedies in the event of material loss.

■ The parties do not dispute that a material loss had occurred and that Purina was unable to deliver goods in the condition contemplated by the agreement. That much is clear. Absent some limiting clause in the agreement, Purina would have been plainly liable to Auger to the extent of its nonperformance. Provided a limitation on remedies is not unconscionable and circumstances do not cause it to fail of its essential purpose, an agreement may provide for remedies in addition to or in substitution for those provided by the Uniform Commercial Code. U.C.C. § 2–719. The Code states specifically, however, that:

> [R]esort to a remedy as provided is *optional* unless the remedy is *expressly* agreed to be exclusive, in which case it is the sole remedy.

U.C.C. § 2–719(1)(b) (emphasis added). Comment 2 to § 2–719 states:

> Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed.

■ Section 4 of the sale agreement provides that in the event of a material loss the buyer "may" make two contractual elections.[5] The word "may" is normally understood to mean "[i]s permitted to; has liberty to. * * * Where there is nothing in the connection of the language or in the sense and policy of the provision to require an unusual interpretation, its use is merely permissive and discretionary". 2 Bouvier's Law Dictionary 2168 (8th ed. 1914). "While parties may agree to limit the remedies for breach of their contract, the policy of the Uniform Commercial Code disfavors limitations * * *". *Chemetron Corp. v. McLouth Steel Corp.*, 381 F.Supp. 245, 250 (N.D.Ill.1974), aff'd, 522 F.2d 469 (7th Cir. 1975). We cannot find in the language of Section 4, or elsewhere in the sale agreement, a clear manifestation of purpose from which it could fairly be concluded that the parties had "expressly agreed" that the two options were to be the exclusive remedies available to Auger in event of a material loss.[6] We therefore hold, contrary to the District Court, that such alternatives were optional and not exclusive remedies. The parties therefore did not limit the available remedies by the terms of the sale agreement.[7]

difference in both Missouri and Maine. Mo. Rev.Stat.1969, Chapter 400, §§ 400.1–101 *et seq.*; Maine Rev.Stat.Ann.1964, Title 11, §§ 1–101 *et seq.*

5. The agreement speaks in terms of "may either * * * or * * *." "Either" is not in itself a word of exclusivity; obviously, the buyer cannot demand both abatement *and* termination.

6. Contractual provisions have been found to limit a buyer's remedies only in situations where such intention was clearly expressed in the language and terms of the contract. *See Fredonia Broadcasting Corp. v. RCA Corp.*, 481 F.2d 781, 797–98 (5th Cir. 1973); *Dow Corning Corp. v. Capitol Aviation, Inc.*, 411 F.2d 622, 626 (7th Cir. 1969).

7. Our review of the record discloses no evidence of collusion between Purina and Auger to place the loss on Hartford. The sale agree-

Auger became liable to pay the contract price for the goods accepted, *see* U.C.C. § 2–607(1); but, although the acceptance operated to preclude Auger's rejection of the goods accepted, it did not "of itself impair any other remedy provided by [the Code] for non-conformity." U.C.C. § 2–607(2). *See* Comments 2 and 3 to § 2–607. Thus, a buyer who has accepted goods and has given proper notice of nonconformity of tender may recover as damages "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." U.C.C. § 2–714(1). This includes incidental and consequential damages arising from such breach. U.C.C. §§ 2–714(3) and 2–715.

Putting it another way, Auger's election to accept the contract did not cut off his rights against Purina for nonperformance either under the Uniform Commercial Code or by reason of the provisions of Section 4 of the sale agreement. His right to damages arose under the sale agreement following the occurrence of a material loss and did not depend upon the subsequent settlement agreement.[8]

Since Auger's acceptance of the goods did not bar his claim for damages under the sale agreement, the nature of the claim was not "collateral", as the District Court concluded, but was one "arising out of [Purina's] legal liability (whether imposed by law or assumed under contract[)] for damages, direct or consequential, because of * * * property damage."[9] While the policy coverage excludes failure to perform a contract, such exclusion expressly does not apply to "physical injury to tangible property". We hold that Hartford was therefore liable under its bumbershoot policy to indemnify Purina to the extent of its liability to Auger for damages resulting to Auger from Purina's nonperformance under the sale agreement, which amount the parties have stipulated to be $385,000.[10]

The judgment of the District Court is reversed and remanded with instructions to enter judgment in favor of Purina in an

---

ment and the Code defined the rights and liabilities between the parties, and they negotiated as to those rights and liabilities. Hartford was invited to participate in those negotiations but declined.

**8.** The "risk of loss" arguments by the parties are misleading. It is true that under the sale agreement Purina retained the risk of loss until closing. This does not alter the effect of the Uniform Commercial Code, which provides that "[w]here a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance." U.C.C. § 2–510(1). The loss in this case occurred prior to acceptance, and Purina could not shift the loss resulting from its own breach to Auger. *See Southland Mobile Home Corp. v. Chyrchel*, 255 Ark. 366, 371–73, 500 S.W.2d 778, 781–82 (1973); *McKnight v. Bellamy*, 248 Ark. 27, 29–35, 449 S.W.2d 706, 707–09 (1970); *William F. Wilke, Inc. v. Cummins Diesel Engines, Inc.*, 252 Md. 611, 250 A.2d 886, 889–90 (1969). *See also* Comment 2 to § 2–510.

It is no answer for Hartford to argue that since title and risk of loss remained in Purina, Auger acquired no interest which could be the subject of a claim for damages. The contrary is true. "Risk of loss" has a broader meaning. "To say that seller had the risk of loss at the time the goods were destroyed is to say that he is liable in damages to the buyer for nondelivery unless he tenders a performance in replacement for the destroyed goods." J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code § 5–1, at 134 (1972). Since Purina's nonperformance resulted from its own negligence, it could not have claimed the escape hatch available to the innocent under U.C.C. § 2–613. *See* R. Nordstrom, Handbook of the Law of Sales § 131, at 395 n. 76 (1970).

**9.** Paragraph II of the bumbershoot policy provided:

*COVERAGE A—LEGAL LIABILITY* (Other Than Director's and Officer's Liability and Marine Protection & Indemnity). The company will indemnify the insured for that portion of the *ultimate net loss* immediately in excess of the applicable *retained limit* arising out of the *insured's* legal liability (whether imposed by law or assumed under contract[)] for damages, *direct or consequential*, because of *personal injury* or *property damage*.

\* \* \* \* \* \*

**10.** The parties also stipulated that $30,639.58 was a reasonable amount for expenses incurred by Purina for investigation and defense, for which Hartford becomes liable unders its policy in addition to the settlement.

amount consistent with the settlement between Purina and Auger.