**Merle L. HIBBS,**
**Appellant/Cross-appellee,**

**v.**

**K–MART CORPORATION,**
**Appellee/Cross-appellant.**

**Nos. 88–1415, 88–1629.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 19, 1988.

Decided March 13, 1989.

David J. Dutton, Waterloo, Iowa, for appellant/cross-appellee.

Robert G. Allbee, Des Moines, Iowa, for appellee/cross-appellant.

Before McMILLIAN and WOLLMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

McMILLIAN, Circuit Judge.

Merle L. Hibbs appeals from a final judgment entered in the District Court[1] for the Southern District of Iowa granting a motion by K–Mart Corp. (K–Mart) for judgment notwithstanding the verdict (jnov) for Hibbs on his breach of contract claims.

For reversal, Hibbs argues that the district court erred in (1) ruling that the record was devoid of any evidence of a direct contractual relationship between Hibbs and K–Mart, (2) ruling that the record was devoid of any evidence that K–Mart acted improperly in terminating its sublease with Hanover Marshalltown, Inc. (Hanover Marshalltown),[2] (3) ruling that the record was devoid of any evidence that Hibbs was an intended beneficiary of the sublease between K–Mart and Hanover Marshalltown, (4) refusing to instruct the jury on an agency theory, and (5) conditionally granting K–Mart's alternative motion for a new trial. K–Mart cross-appeals from the order of the district court denying all of its costs with the exception of docket fees of $27.50. For the reasons discussed below, we affirm the judgment of the district court. The appeal and cross-appeal are denied.

Merle L. Hibbs is a real estate broker in Marshalltown, Iowa. In the mid–1970's Hibbs purchased several adjoining parcels of land at the intersection of state Highway 14 and United States Highway 30 south of Marshalltown in order to develop a shopping center. He eventually accumulated twenty-three acres of land at the northwest corner of the intersection.

In March 1978 Hibbs was contacted by Tom Niemera who identified himself to Hibbs as a site finder for Hanover Development Co. (Hanover Development). Niemera discussed with Hibbs the possibility of Hibbs' granting Hanover Development an option to lease the property Hibbs owned

---

**1.** The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

**2.** There are three related corporate entities involved in this case. They are variously referred to in the opinion as Hanover Development, Hanover Marshalltown, and Jack Jacobs & Co. They are all essentially the same entity for purposes of this appeal. When referred to collectively, they will be called "Hanover."

at the intersection. The initial meeting between Hibbs and Niemera was followed by Hibbs' visit on October 10, 1978, to the offices of Hanover Development in Chicago to meet with Niemera, Jack Jacobs, and Eugene Faigus, all of whom were officers or employees of Hanover Development or one of its subsidiaries.

Hanover Development was a commercial development company in the business of building and leasing stores to major retailers such as K–Mart. It had developed forty-five to fifty shopping centers with K–Mart as the anchor tenant but had also worked with other major retailers. K–Mart owned no interest in Hanover Development or any of its subsidiaries. Nor did any K–Mart employees serve as directors or officers of Hanover Development or any of its subsidiaries.

At the Chicago meeting, Hibbs entered into an option agreement with Hanover Development for a portion of his Marshalltown property. Hanover was granted an exclusive 90–day option to lease Hibbs' property pursuant to an agreement and ground lease attached to the option agreement. K–Mart was not mentioned in either the option agreement or the ground lease. The ground lease obligated Hanover Development to construct, at its sole cost and expense, "a modern, first-class shopping center" on the Marshalltown site. Hibbs later granted, at Hanover's request, several 30–day extensions of the option, and a ground lease was executed between Hanover and Hibbs on August 21, 1979. The ground lease was neither reviewed nor approved by K–Mart.

A letter of intent had been sent from K–Mart to Jack Jacobs & Co. (Jacobs & Co.), a subsidiary of Hanover Development, on October 9, 1978. The letter informed Jacobs & Co. that K–Mart officials had approved the leasing of a store to be built by Hanover Development. Hibbs claimed at trial that before he entered into the option agreement with Hanover Development, Jack Jacobs showed him this letter of intent. From this letter Hibbs inferred that Jacobs & Co. was acting on behalf of K–Mart. The letter of intent did not mention Hibbs, and it contained an explicit warning that "any expenditure incurred on ... behalf [of Jacobs & Co.], pursuant to or on the basis of this letter, is undertaken at your sole risk. [K–Mart] recognizes no obligation except as may arise out of the fully-executed lease contemplated herein." The letter stated that the approval was "subject to concluding a mutually satisfactory lease agreement on our semi-Gross lease form within 120 days." The letter also contained the terms of the sublease that K–Mart contemplated entering into with Jacobs & Co.

Negotiations over the terms of the proposed sublease continued between Hanover Development and K–Mart for over one year after Jacobs & Co. received the letter of intent from K–Mart and Hanover Development obtained the option agreement from Hibbs. During this time, K–Mart's original letter of intent expired by its own terms because no sublease had been executed within 120 days. A new letter of intent was issued on December 3, 1979, reflecting new proposed terms, but the entire project remained subject to the execution of a satisfactory sublease agreement.

On May 22, 1980, Hanover executed a sublease with K–Mart reflecting the agreed terms. K–Mart executed the sublease on July 25, 1980. The sublease, between Hanover Marshalltown, a subsidiary of Hanover Development, as landlord, and K–Mart, as tenant, was for a building to be constructed on approximately ten acres of the property Hibbs had leased to Hanover.[3] The term of the sublease was to commence on the date of occupancy of the completed building by K–Mart and was for a period of twenty-five years with ten renewal options of five years each. The sublease warranted that the buildings and site improvements which were the subject of the sublease were to be completed promptly and with due diligence by Hanover. The sub-

---

**3.** Hanover Development executed an assignment of its ground lease with Hibbs to Hanover Marshalltown, a point which Hibbs argues is significant in terms of whether K–Mart was bound by the ground lease but which is, in reality, irrelevant to the issues in the case.

lease also provided that rough site grading would be completed and construction of the foundations and footings begun "no later than August 1, 1980." The sublease also provided that the buildings and improvements were to be "completed in accordance with [K–Mart's] typical plans and specifications and possession thereof tendered to [K–Mart] prior to August 1, 1981." If these conditions were not met, K–Mart had the option of terminating the sublease.

Hanover never began construction of the Marshalltown K–Mart store. It could not obtain the necessary building permits and site plan approval from the City of Marshalltown and the Iowa Department of Transportation. Hanover was also having financial problems which led to its bankruptcy in late 1982, and had, in fact, placed the project on "hold" sometime in 1981 because of these financial problems.

In August 1981 K–Mart began investigating the possibility of locating its Marshalltown store in an already-existing building. In October 1981 K–Mart cancelled its sublease with Hanover. Hanover notified Hibbs of the cancellation and discontinued its rent payments to Hibbs that same month.

Hibbs terminated his ground lease with Hanover and later sued Hanover and Jacobs & Co. for breach of lease. Hibbs obtained a default judgment against them but did not recover any money from them because both entities had declared bankruptcy. Hibbs then commenced this lawsuit against K–Mart.

The case was tried to a jury in December 1987. Prior to trial and at the close of Hibbs' presentation of evidence, K–Mart moved for a directed verdict. The district court reserved ruling on the motion and allowed the case to be submitted to the jury on three theories: (1) breach of lease, (2) intentional interference with the Hibbs ground lease, and (3) third-party beneficiary of the K–Mart sublease. The jury returned verdicts for Hibbs on all three counts and awarded different damage amounts on each theory—$1,178,000 on the breach of lease theory, $300,000 on the

intentional interference theory, and $2,550,000 on the third party beneficiary theory.

K–Mart moved in the alternative for jnov or new trial. The district court granted both motions. *Slip op.*, No. 85–8–36–A (D.Iowa Feb. 11, 1988). This appeal and cross-appeal followed.

## STANDARD OF REVIEW

■ In reviewing the grant of a jnov, this court may sustain the district court only if all the evidence points one way and is not susceptible of any reasonable inferences supporting the jury's findings. *Mississippi Lofts, Inc. v. Lexington Ins. Co.*, 841 F.2d 251, 253 (8th Cir.1988). This court "must resolve direct factual conflicts in favor of [Hibbs], assume as true all facts in [Hibbs'] favor which the evidence tends to prove, and give [Hibbs] the benefit of all reasonable inferences." *Id.* Interpretation of contracts, however, is a question of law for the court, *Ralston Purina Co. v. Hartford Accident & Indemnity Co.*, 540 F.2d 915, 918 n. 3 (8th Cir.1976); *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 783, 785 (Iowa 1985) (*Chariton*), and our review of a ruling based on a legal question is not subject to the standard cited by Hibbs.

## BREACH OF LEASE

■ Hibbs argues that the district court erred in ruling that there was no direct lease obligation between K–Mart and Hibbs because, according to Hibbs, when Hanover Development assigned to Hanover Marshalltown its rights and obligations under the ground lease, K–Mart, as sublessee of Hanover Marshalltown, became bound by the terms of the ground lease. In support of this argument, Hibbs relies on the following language contained in Article XVII of the ground lease:

Further no sublease shall be inconsistent with the terms of this lease and insofar as they are inconsistent Landlord shall only be required to recognize the consistent terms, and that they shall all continue for the duration of their respective terms and any extensions thereof (but in no event beyond the terms of this lease) as a direct lease between Landlord here-

under and the sublessee thereunder, with the same force and effect as if Landlord hereunder had originally entered into such sublease as Landlord thereunder....

According to Hibbs, Article XVII of the ground lease created a direct lease relationship between Hibbs and any sublessee of Hanover. Hibbs argues that when K–Mart executed the K–Mart/Hanover sublease it became bound by all terms of the Hibbs/Hanover ground lease as well as any terms of the sublease which were consistent with the terms of the ground lease. Hibbs then argues that K–Mart breached the terms of the Hibbs/Hanover ground lease. We disagree.

The district court correctly found that there was no privity of contract between Hibbs and K–Mart. There were two separate transactions between the various parties. One was a ground lease between Hibbs and Hanover. The other was a sublease between Hanover and K–Mart. K–Mart was not a party to the ground lease, and Hibbs was not a party to the sublease.

The language relied upon by Hibbs in support of his argument is taken out of context. Preceding that language in the same paragraph of Article XVII is the following:

> If for any reason this lease and leasehold estate of Tenant hereunder is terminated by Landlord by summary proceedings or otherwise in accordance with the terms of this lease, Landlord covenants and agrees that such termination of this lease shall not result in a termination of any sublease.

Article XVII also provides that "any sublessee shall upon termination of [the] lease enter into an attornment agreement with Landlord ... which shall specifically contain an exculpation clause for the benefit of Landlord."

When read as a whole, Article XVII is properly viewed as a clause protecting the rights of sublessees in the event that the lease between their landlord and Hibbs is terminated. Contrary to Hibbs' assertion, Article XVII does not automatically create a direct lease relationship between Hibbs

and any sublessees of Hanover. If for no other reason, Article XVII did not create such a relationship because K–Mart did not agree to it. K–Mart was neither a party to the ground lease nor was there any provision in the sublease between it and Hanover whereby it agreed to be bound by the terms of the ground lease. See 51C C.J.S. Landlord & Tenant § 48(1)(b), at 143 (1968) (unless lessor and sublessee agree, "there is ordinarily neither privity of estate nor of contract between the lessor and sublessee.")

The district court's ruling on this issue was based upon its interpretation of Article XVII of the ground lease between Hibbs and Hanover. See Chariton, 369 N.W.2d at 783, 785. We hold that the district court was correct in its interpretation of the ground lease. Hibbs cites no other evidence which would support his argument that there was privity of contract between Hibbs and K–Mart.

## INTENTIONAL INTERFERENCE WITH THE GROUND LEASE

Hibbs argues that in setting aside the jury verdict on this claim, the district court erred in relying solely on K–Mart's motivation in protecting its economic interests to find that there was no evidence to support a conclusion that K–Mart had acted improperly. See Peterson v. First Nat'l Bank, 392 N.W.2d 158, 167 (Iowa Ct.App. 1986) (Peterson) (economic justification is affirmative defense). Hibbs argues that Restatement (Second) of Torts § 766 (1979), which describes the tort of intentional interference with contract, should be read together with § 767, which lists the factors to be considered in determining whether interference with a contract is improper. According to Hibbs, when all the factors listed in § 767 are considered, the jury's finding on this claim "can easily be sustained." We disagree.

Under Iowa law, the elements of the tort of intentional interference with contractual relations are:

1. The existence of a valid contractual relation;

2. Knowledge of the relationship;

3. Intentional interference inducing or causing a breach or termination of the relationship; and

4. Resultant damage to the party whose relation has been disrupted.

*C.F. Sales, Inc. v. Amfert, Inc.*, 344 N.W. 2d 543, 555 (Iowa 1983) (*Amfert*) (quoting *Stoller Fisheries, Inc. v. American Title Ins. Co.*, 258 N.W.2d 336, 340 (Iowa 1977)).

The plaintiff need not prove improper purpose on the part of the interfering defendant, that is, "a purpose to injure or destroy an existing contract" is not an essential element of the prima facie case. *Amfert*, 344 N.W.2d at 555 (citing *Farmers Co-op. Elevator, Inc. v. State Bank*, 236 N.W.2d 674, 679 (Iowa 1975)). It is not clear whether, under Iowa law, a plaintiff must, in addition to the other elements, plead and prove that the alleged acts of interference were improper. *See Wolfe v. Graether*, 389 N.W.2d 643, 659–60 (Iowa 1986) (*Wolfe*) (language in cases as well as Iowa Uniform Jury Instructions based upon *Restatement (Second) of Torts* (Tent. Draft No. 14, 1969) and antedated final edition which includes "improper acts" as an element to be proved). It is clear, however, that whether the alleged acts of interference were improper can become an issue in the case where the affirmative defense of economic justification is raised. *Peterson*, 392 N.W.2d at 167; *see also Wolfe*, 389 N.W.2d at 659–60 (difference between *Restatement (Second) of Torts* (Tent. Draft No. 14, 1969) and final version with respect to problem of how to treat issue of improper acts is one of burden of proof; *and Restatement (Second) of Torts* § 767 comment b (same)).

Hibbs' argument with respect to the issue of improper interference with the ground lease depends upon his assertion that K–Mart breached its sublease with Hanover. *But cf. Harsha v. State Sav. Bank*, 346 N.W.2d 791, 799 (Iowa 1984) (in cause of action alleging intentional interference with prospective business relations, deliberate breach of contract generally not improper means unless there was intent to injure plaintiff). By the terms of the sublease, K–Mart had a right to terminate the

sublease if Hanover had not constructed a building "in accordance with [K–Mart's] typical plans and specifications and possession thereof tendered to [K–Mart] prior to August 1, 1981." Because the building was not even begun on that date, K–Mart was justified in terminating the sublease.

Hibbs argues, however, that the building and improvements were not completed because K–Mart improperly acted in such a way as to prevent Hanover from completing the building project. In support, Hibbs cites several design and specification changes made by K–Mart over the course of its negotiations with Hanover. Hibbs contends that K–Mart's allegedly improper actions in this regard caused Hanover to be unable to build the store as required by the terms of the sublease. K–Mart was therefore in breach when it terminated the sublease because it had not acted in good faith. Hibbs argues further that the termination of the sublease was the precipitating factor causing Hanover to breach the ground lease. Hibbs concludes that a submissible case was made on this issue and the jury properly returned a verdict for him on the intentional interference claim. We disagree.

The record shows that K–Mart issued a letter of intent on December 3, 1979, agreeing in principle to lease a 60,842 square foot store from Hanover. In February 1980 K–Mart modified the store plans by moving the automobile service center from one side of the store to the other. On July 25, 1980, K–Mart executed the sublease with Hanover. In July 1981, after Hanover was already in default according to the terms of the sublease requiring that rough site grading be completed and construction of the foundations and footings begun by August 1, 1980, K–Mart issued an across-the-board change in all 60,842 square foot stores built in 1982. As K–Mart points out, this change would not have applied to the store to be built by Hanover if Hanover had completed it on time, that is, by August 1, 1981.

The relatively minor changes in specifications and building plans made by K–Mart prior to its execution of the sublease in

July 1980 are facially reasonable, that is, they are justifiable acts that promoted K–Mart's economic interests. They are also irrelevant to the issue of whether K–Mart breached the sublease because they occurred before there was a sublease that could be breached.

THIRD–PARTY BENEFICIARY

Hibbs argues that the district court erred in setting aside the jury verdict on this claim because he was an intended third-party beneficiary of the Hanover/K–Mart sublease. We disagree.

In order to be a third-party beneficiary of a contract, the contracting parties must intend that the third party receive a direct or primary benefit. "[I]t has been declared that for anyone to be a third-party beneficiary entitled to recover on a contract both parties to the contract must so intend and must indicate that intention in the contract." *Bailey v. Iowa Beef Processors, Inc.*, 213 N.W.2d 642, 645 (Iowa 1973) (*Bailey*) (citing 17 Am.Jur.2d *Contracts* § 304, at 729–30), *cert. denied*, 419 U.S. 830, 95 S.Ct. 52, 42 L.Ed.2d 55 (1974). In order for a landowner to be a third-party beneficiary of a sublease, an intent to benefit the landowner must appear from the language of the sublease. *White v. Flood*, 258 Iowa 402, 138 N.W.2d 863, 866 (1965) (*White*) (citations omitted). The economic consequences to the third party in the event that the agreement between the contracting parties is breached "do not necessarily relate to the controlling question of whether the parties who entered the contract intended and expressed an intention to benefit those claiming to be third-party beneficiaries." *Bailey*, 213 N.W.2d at 646.

The only evidence Hibbs cites in support of this claim to third-party beneficiary status is that (1) Hanover and K–Mart knew that Hibbs would profit from a K–Mart store being built on the site, (2) the funds K–Mart used to pay rent to Hanover would be used by Hanover to pay rent to Hibbs, (3) by the terms of the sublease, K–Mart was required to pay taxes on the land and improvements thereon, (4) the improvements made pursuant to the sublease were to be left in place at the end of the lease term, and (5) the sublease provided that "[a]ll covenants and agreements of [the] [sub]lease shall run with the land."

None of this evidence supports a conclusion that Hibbs was the intended beneficiary of the sublease. The contracting parties' knowledge that Hibbs would profit is not the same thing as their intending that Hibbs benefit from the sublease. *See Bailey*, 213 N.W.2d at 646. K–Mart's obligation to pay rent to Hanover was completely separate from Hanover's obligation to pay rent to Hibbs as evidenced by the fact that K–Mart's obligation never materialized due to Hanover's noncompliance with the terms of the sublease, whereas Hanover's obligation began at the time it entered into the ground lease with Hibbs. *See Restatement (Second) of Contracts* § 302 comment e, illustration 17 (1981). Hanover was obligated by the terms of the ground lease to pay all taxes on the property, so any assumption by K–Mart of this obligation under the terms of the sublease conferred a benefit on Hanover, not Hibbs. Leaving improvements in place at the end of a long-term sublease is at most an incidental benefit of the sublease. *See Restatement (Second) of Contracts* § 302 comment e, illustrations 16 & 19. Finally, the provision of the sublease that all covenants of the sublease would run with the land would have directly benefitted K–Mart's or Hanover's transferees under the sublease, not Hibbs, because the covenants of the sublease did not directly benefit Hibbs. In sum, there was nothing in the language of the sublease to indicate an intent to benefit Hibbs. *White*, 138 N.W. 2d at 866.

Further, as we have stated elsewhere in this opinion, K–Mart acted properly in terminating the sublease. There was, therefore, no breach from which damages would flow to Hibbs even if he had been an intended beneficiary of the sublease.

AGENCY

Hibbs argues that the district court erred in refusing to instruct the jury on an agency theory because he presented evidence that would have supported a jury

verdict based on apparent authority or agency by estoppel. We disagree.

Hibbs argues that Hanover was the agent of K–Mart because K–Mart controlled Hanover. In support, Hibbs relies on his impression that Hanover Development's Chicago offices "were permeated by K–Mart and its logo." He also relies on K–Mart's promotional activities in conjunction with the new K–Mart store that was to be built on the Marshalltown site. Hibbs also alleges that K–Mart continuously employed Hanover Development for over ten years and had control over all of the plans for the proposed store. The evidence does not support either agency theory advanced by Hibbs.

*Restatement (Second) of Agency* § 8 (1958) provides that "[a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." Comment b includes as actions that may vest one with apparent authority manifestations to the community such as signs, advertising, or continuous employment of the agent. *Id.* "Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the agent to be authorized." *Id.* comment c.

Nothing K–Mart did could be reasonably interpreted by Hibbs, a sophisticated shopping center developer, to mean that K–Mart had consented to have Hanover act on its own behalf. On the contrary, all of the evidence points in the other direction. First, when Tom Niemera introduced himself to Hibbs, his business card indicated that he was a site finder for Hanover Development, not K–Mart. Second, the K–Mart letter of intent dated October 9, 1979, that Hibbs claims he relied upon when granting Hanover an option to lease the Marshalltown site clearly stated that K–Mart recognized "no obligation" from any expenditures incurred by Hanover on the basis of the letter and that Hanover was acting at its own risk. Third, there is no

evidence that K–Mart was responsible for or aware of the extensive use of K–Mart logos and pictures in Hanover's Chicago office and cannot be said to have made any manifestations in that respect. Fourth, the signs erected on the Marshalltown site merely announced that a K–Mart was to be built there and did not convey the impression that Hanover was acting as K–Mart's agent. Fifth, there is no evidence that Hanover had been continuously employed as K–Mart's agent. Rather, the evidence establishes only that Hanover had built stores for K–Mart and other retail chains as a developer. Sixth, K–Mart's control over building plans was no more than one would expect when a chain store of uniform type is being built by a shopping center developer. Finally, the fact that Hibbs never treated Hanover as K–Mart's agent in any litigation until he was unable to collect his judgment against Hanover due to the latter's bankruptcy is relevant insofar as it indicates a lack of reliance on any alleged manifestations by K–Mart that Hanover was authorized to act on K–Mart's behalf.

■ Because reasonable reliance is also an essential element of any claim based upon agency by estoppel, Hibbs' argument that such theory should have been submitted to the jury fails. As we have discussed above, the evidence clearly indicates that Hibbs could not have reasonably changed his position in reliance upon a belief that Hanover was empowered to act on K–Mart's behalf. *See Restatement (Second) of Agency* § 8B.

Because Hibbs did not make out a prima facie case of either apparent authority or agency by estoppel, the district court acted properly in refusing to submit the case to the jury on an agency theory. *See Chariton,* 369 N.W.2d at 789 (burden of proving agency is on party alleging its existence; to create a jury question, there must be substantial evidence presented of existence of agency).

COSTS

■ On cross-appeal, K–Mart argues that the district court abused its discretion in denying all of K–Mart's costs "as not

reasonably necessary to the conduct of the litigation" with the exception of $27.50 for docket fees. According to K–Mart, Fed.R. Civ.P. 54(d) carries a heavy presumption favoring an award of costs to the prevailing party and only a measure of discretion to order otherwise. K–Mart argues that to deny its costs amounts to an unjustified penalty. *See EEOC v. Rath Packing Co.*, 787 F.2d 318, 338 (8th Cir.), *cert. denied*, 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986).

In making its argument, K–Mart overlooks the fact that both 28 U.S.C. § 1920 and Fed.R.Civ.P. 54(d) are phrased in permissive terms. Section 1920 provides that "[a] judge or clerk of any court of the United States *may* tax as costs" certain enumerated items (emphasis added). Rule 54(d) provides in part that "[e]xcept when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party *unless the court otherwise directs.*" (emphasis added). *See also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987) ("Section 1920 ... is phrased permissively because Rule 54(d) generally grants a federal court discretion to refuse to tax costs in favor of the prevailing party."); *Pershern v. Fiatallis North America, Inc.*, 834 F.2d 136, 140 (8th Cir.1987) (same).

We have reviewed the entire record as well as the briefs of the opposing parties. We are satisfied that the district court did not abuse its discretion in awarding $27.50 for docket fees to K–Mart and in denying the rest of its costs.

Accordingly, the judgment of the district court is affirmed.

Given our disposition of the case, we need not address Hibbs' claim that the district court erred in granting K–Mart's alternative motion for a new trial.