Argued and submitted July 10, affirmed December 27, 2006

Norma J. BERRY
and Robert D. Berry, Jr.,
*Respondents,*

*v.*

Carolyn LUCAS;
Jerry Lucas;
and By The Sea Homes, Inc.,
an Oregon corporation,
*Appellants.*

03CV0307; A124777

150 P3d 424

David M. Hernandez argued the cause for appellants. With him on the briefs was Hernandez & Associates, L.L.C.

Patrick M. Terry argued the cause and filed the brief for respondents.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Cramer, Judge pro tempore.

CRAMER, J. pro tempore.

**CRAMER, J. pro tempore**

This appeal arises from a contract dispute regarding a manufactured home placed on a lot in Bandon, Oregon. Following a bench trial, the trial court entered a judgment in favor of plaintiffs and awarded damages of $6,535. Defendant appeals and, for the reasons discussed below, we affirm.[1]

We take the facts—which are undisputed—from the record and the trial court's findings in its letter opinion. Defendant is in the business of the retail sale of manufactured homes. In September 2002, plaintiffs and defendant entered into a contract in which plaintiffs agreed to purchase a Redman manufactured home for $69,040. As the trial court explained:

> "The contract consisted of a printed form (front and back) and three exhibits. Defendant agreed as part of the contract to deliver and set up the manufactured home on a lot owned by plaintiffs in Bandon, Oregon. The parties contemplated that plaintiffs would be receiving a home suitable for occupancy. The contract provided that plaintiffs would pay 50% down and the balance on delivery. * * *
>
> "As part of the contract, the parties certified that the terms printed on the back side of the contract were part of the contract, and furthermore, plaintiffs acknowledged by signing the contract that they had read and understood the contract and received a copy of the contract."

Plaintiffs mailed a check for one-half of the purchase price to defendant in September 2002 and mailed a check for the remaining balance in early November.

The manufactured home was delivered in two sections to plaintiffs' lot on November 15, 2002, and placed on a

---

[1] The complaint named By The Sea Homes, Inc., and its officer-shareholders Carolyn and Jerry Lucas as defendants. At the conclusion of the trial, the court dismissed the claims against the Lucases as individuals; that ruling is not challenged on appeal. Accordingly, references in this opinion to "defendant" are to By The Sea Homes, Inc.

concrete slab that had been constructed by plaintiffs' contractor. About a month later—before the home had been completed and prepared for occupancy—it suffered severe storm damage. The trial court found:

> "As of that date, the carpet inside the home had not been laid, railings remained to be installed, sheet rock still needed to be installed and exterior siding on the west end had not yet been installed. * * * [T]he home was not ready to be moved into because set up work remained to be done by the defendant, and its agent, both inside and outside the home. The carpet work, the railings, the sheet rock and the exterior siding were the responsibility of defendant. Neither party had insurance on the manufactured home as of the date of the storm damage. Plaintiffs paid a contractor $6535 to repair the damage."

Plaintiffs filed this action to recover the repair bill plus lost wages of $350. They first alleged that defendants violated the Unlawful Trade Practices Act (UTPA). In a second count, plaintiffs alleged that the damage to the manufactured home "was sustained after the manufactured home was shipped to the specified destination but before Defendants could tender delivery or Plaintiffs could inspect and potentially accept the goods." Plaintiffs alleged that defendant refused to repair the wind and rainwater damage and that plaintiffs therefore had to incur the expense of having the repair performed.

The trial court found in defendants' favor on the UTPA claim and, as noted, dismissed the claims against the individual defendants and entered a money judgment in favor of plaintiffs on the contract claim. Defendant appeals, arguing that the trial court erred in finding in plaintiffs' favor and awarding damages. Because we agree with the trial court that the risk of loss was on defendant at the time the storm damage occurred, we affirm.

■ As a general matter, Oregon's codification of the Uniform Commercial Code (UCC) governs sales contracts of the type involved here. But, "[t]he effect of provisions of the Uniform Commercial Code may be varied by agreement, except as otherwise provided in the Uniform Commercial Code."

ORS 71.1020(3); *see also* ORS 72.5090(4) (regarding the provision addressing risk of loss in the absence of breach, "[t]he provisions of this section are subject to contrary agreement of the parties"). Defendant acknowledges the general applicability of the UCC, but argues that a provision of the contract governs the risk of loss in this case and is dispositive. We begin with that argument.[2]

Paragraph 12 of the sales contract states:

> "**INSURANCE**. Buyer understands that Buyer is <u>not</u> covered by insurance on the unit purchased until accepted by an insurance company, and Buyer agrees to hold Dealer harmless from any and all claims due to loss or damage prior to acceptance of insurance coverage by an insurance company."

(Underscoring and boldface in original.) Defendant argues that paragraph 12 addresses risk of loss and that resort to the UCC provisions regarding risk of loss therefore is unnecessary. It argues that paragraph 12 "effectively allocates the risk of loss to the buyer before complete performance of the contract." According to defendant, the risk of loss under paragraph 12 had passed to plaintiffs at the time of the storm damage.

In interpreting a contract, we first examine the text and context to determine if the contract is ambiguous. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 317-18, 129 P3d 773, *rev den*, 341 Or 366 (2006). Whether a contract is ambiguous presents a question of law. *Id.* at 317. In addition to examining the text and context of the provision, the court, in determining whether the contract is ambiguous, is also to consider extrinsic evidence of "the circumstances underlying the formation of the contract." *Id.* at 317. Finally, if the "provision remains ambiguous after the first two steps have been followed, the court relies on appropriate maxims of construction" to determine the provision's meaning. *Yogman v. Parrott*, 325 Or 358, 364, 937 P2d 1019 (1997).

Paragraph 12 does not, on its face, address risk of loss. It follows a heading that reads, "Insurance." Its text focuses on the effect of insurance coverage, not a time in the

---

[2] Defendant makes other arguments, which we reject without discussion.

transaction that will shift the risk of loss from seller to buyer.[3] Moreover, as plaintiff points out, at the time the parties entered into the contract, the manufactured home had not yet been constructed by the manufacturer. According to plaintiff,

> "it seems nonsensical and illogical to force the Plaintiff to bear the risk of loss for a manufactured home that had yet to be manufactured and yet to be placed in the control of the Defendant. * * * It also seems untenable to force the Plaintiff to bear the risk of loss when the Defendant and Defendant's agents are still working on setting up the manufactured home, in accordance with their contractual duties."

Although we are not convinced that paragraph 12 addresses risk of loss, the provision arguably is ambiguous in that regard. That is, it could be read to place the risk of loss on the buyer from the time the contract is signed. Or, as plaintiff argues, it could be read to simply not address risk of loss at all. The parties point to no extrinsic evidence that resolves the ambiguity or that sheds light on the parties' intention. In light of the provision's ambiguity, we proceed, then, to ascertain the provision's meaning by applying maxims of construction.

■ Two maxims apply to the provision at issue here. First, it is a basic tenet of contract law that ambiguous language in a contract is construed against the drafter of the contract. *Hill v. Qwest*, 178 Or App 137, 143, 35 P3d 1051 (2001). Here, the form contract was provided by defendant, and applying that maxim leads to the conclusion that the parties did not intend to reallocate the risk of loss by the paragraph relating to insurance.

---

[3] Defendant asserts that paragraph 12 should be interpreted in the context of paragraph 15, which provides, in part, "Buyer understands that unless otherwise provided on the other side of this contract, the unit purchased is sold by Dealer F.O.B. Dealer's lot and Buyer is responsible for transporting it." According to defendant, paragraph 15 "shows that the parties intended a shipment contract, with the risk of loss shifting when the mobile home was delivered to the carrier." But, the parties did, in fact, "otherwise provide" by including the following provision on the reverse side of the contract: "Sales price includes setup and delivery within 50 miles of sales lot." Paragraph 15 provides no interpretive aid in construing paragraph 12. If anything, the explicit agreement of the parties that defendant would deliver and set up the manufactured home suggests that the parties did not intend the risk of loss to be on plaintiffs until the set-up was complete.

■ The second relevant maxim is one that is more specific to the situation involved here. That maxim is that, to allocate risk of loss in a manner different from that contemplated by the UCC, "the parties must expressly shift the risk of loss and such a shift will not readily be inferred." *Galbraith v. American Motorhome Corporation*, 14 Wn App 754, 757-58, 545 P2d 561, 563 (1976); *see also McKenzie v. Olmstead*, 587 NW2d 863, 865 (Minn Ct App 1999) ("The implications of any contrary agreement regarding allocation of the risk of loss * * * should be explicit and understood by both parties."). Moreover, insurance provisions in a contract—such as a provision that the buyer must insure a yacht while the seller was installing options after receiving the boat from the manufacturer—have been held not to allocate the risk of loss contrary to the relevant UCC provision. *Hayward v. Potsma*, 31 Mich App 720, 724, 188 NW2d 31, 33 (1971). Rather, as the *Hayward* court held, "we feel that a contract which shifts the risk of loss to the buyer before he receives the goods is so unusual that a seller who wants to achieve this result must make his intent very clear to the buyer." *Id.*[4]

■ Applying those two maxims, and considering the text in context, we conclude that the parties did not intend to vary the risk of loss from that provided in the UCC. We turn, accordingly, to the UCC provision governing risk of loss.

Risk of loss in this case is governed by ORS 72.5090, which provides, in part:

"(1)  Where the contract requires or authorizes the seller to ship the goods by carrier:

"* * * * *

"(b)  *If it does require the seller to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery.*

"* * * * *

---

[4] We recognize that we are not, of course, bound by the interpretations of courts in other jurisdictions. But, because we are directed by ORS 71.1020 to liberally construe provisions of the UCC "[t]o make uniform the law among the various jurisdictions," we carefully consider decisions from other states.

"(3)   In any case not within subsection (1) or (2) of this section, the risk of loss passes to the buyer on receipt by the buyer of the goods if the seller is a merchant; otherwise the risk passes to the buyer on tender of delivery.

"(4)   The provisions of this section are subject to contrary agreement of the parties and to the provisions of ORS 72.3270 on sale on approval and ORS 72.5100 on effect of breach on risk of loss."

(Emphasis added.) The contract between plaintiffs and defendant required defendant to deliver the manufactured home to plaintiffs' lot and to set it up. The transaction thus is governed by ORS 72.5090(1)(b). In short, the "goods" that plaintiffs purchased consisted of a complete manufactured home, placed on their lot, and ready for occupancy.

At the time of the storm damage, defendant had not supplied the goods that it had agreed to tender. Rather, it had provided an as-yet incomplete manufactured home. Under ORS 72.5090(1)(b), risk of loss passes to the buyer only after the goods are "duly so tendered as to enable the buyer to take delivery." ORS 72.5030(1) provides, in part, that "[t]ender of delivery requires that the seller put and hold *conforming goods* at the buyer's disposition and give the buyer any notification reasonably necessary to enable the buyer to take delivery." (Emphasis added.) And under ORS 72.1060(2), "Goods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract."

Here, although defendant had partially performed under the contract, it had not tendered delivery of a completed manufactured home by putting conforming goods at plaintiffs' disposition. Simply put, defendant had not—at the time that the damage occurred—tendered delivery of the goods for which plaintiffs had contracted. And because, under ORS 72.5090(1)(b), the risk of loss is on the seller until such tender has occurred, the risk remained on defendant at the time the storm damaged the manufactured home. It follows that the trial court correctly entered judgment in favor of plaintiffs.

Courts applying other states' versions of the UCC have reached the same conclusion—although not necessarily following the exact route we have. *Moses v. Newman,* 658 SW2d 119 (Tenn Ct App 1983), is the case most factually similar to this one. As in this case, the seller had agreed to provide a mobile home and to set it up on the buyer's lot. As in this case, the home was delivered to the lot but, before the seller could complete the set-up, a windstorm destroyed the home. Although the court analyzed the liability issue under UCC 2-510 (codified in Oregon as ORS 72.5100), its analysis was analogous to ours. It concluded that, although the buyer had placed certain items of personal property in the home before it was destroyed, the buyer had not accepted delivery of the home at that time. *Id.* at 122. Moreover, the court explained that the risk of loss had not passed from the seller to the buyer at the time the goods were destroyed:

> "In this case, plaintiff contracted for a habitable mobile home plus the installation. Accordingly, since the loss occurred before the installation was complete, the defendant had not delivered conforming goods which would shift the risk of loss to plaintiff."

*Id.*

Similarly, in *Southland Mobile Home Corporation v. Chyrchel,* 255 Ark 366, 500 SW2d 778 (1973), the plaintiff purchased a mobile home from the defendant. After delivering the mobile home and placing it in position, the defendant hooked up the sewer and gas connections, but did not complete other connections. *Id.* at 367, 500 SW2d at 779. Before the connections were completed, an explosion occurred and extensively damaged the mobile home. *Id.* at 368, 500 SW2d at 779. In addressing the risk of loss issue, the Arkansas Supreme Court rejected the argument "that the sale was complete before the fire and the risk of loss had passed to the buyer." *Id.* at 371, 500 SW2d at 781. The court concluded that the risk of loss never passed to the buyer because the seller had not delivered conforming goods. *Id.* at 372, 500 SW2d at 782.

Other courts, albeit in somewhat different factual contexts, have reached the same result. *See, e.g., In re Thomas,* 182 BR 347, 349 (SD Fla 1995) (buyer purchased

pool heater under contract that included installation; seller dropped heater off on buyer's driveway, from where it was stolen; United States Bankruptcy court concluded that unit never was "delivered," so that risk of loss remained on seller); *William F. Wilke, Inc. v. Cummins Diesel Engines, Inc.*, 252 Md 611, 618, 250 A2d 886, 890 (1969) (contract called for purchase, installation, and field testing of diesel generator; damage occurred after generator was installed, but before other obligations were performed; the court held, "[W]e have no difficulty in holding that the delivery of the generator to the job site, while identifying the goods to the contract, did not amount to a delivery of goods or the performance of obligations conforming to the contract. It could not constitute such a delivery and performance until the generator had been installed, started up, and field tests completed.").

In sum, because plaintiffs contracted for a completed manufactured home and no such home had been delivered at the time the windstorm damage occurred, the risk of loss was still on defendant at that time. Accordingly, the trial court correctly found in favor of plaintiffs and awarded damages.

Affirmed.