**Roger LYONS, Plaintiff,**

v.

**MIDWEST GLAZING, d/b/a Eddy's Glass & Door, Defendant.**

**No. C01–3071–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

June 6, 2003.

Patricia L. Hoffman–Simanek, Mark L. Zaiger, Shuttleworth & Ingersoll, Cedar Rapids, IA, for defendant.

Randall E. Nielsen, Pappajohm-Shriver-Eide- Nicholas, Mason City, IA, for plaintiff.

**MEMORANDUM OPINION AND ORDER REGARDING BENCH TRIAL ON THE MERITS**

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ...............................................1064

II. FINDINGS OF FACT ..........................................1065
 A. Applicable Standards .....................................1065
 B. Factual Findings .........................................1065
 1. Eddy's Glass & Door: Then and now ................1065
 2. Managerial difficulties ...........................1066
 3. Poor morale ......................................1067
 4. Paid time off ....................................1069
 5. Mr. Lyons's termination and subsequent employment ...1070

III. CONCLUSIONS OF LAW .......................................1071
 A. Choice of Law ...........................................1071

**B. Breach–of–Contract Claim** .......................................... 1072
 *1. Burden of proof* ........................................... 1073
 *2. Did Midwest Glazing have cause for termination?* ................... 1073
**C. Midwest Glazing's Counter–Claims** ............................... 1074
 *1. Tortious interference* ........................................ 1075
 *2. Breach of fiduciary duty* ..................................... 1075

*IV. CONCLUSION* ................................................... 1077

After a one-day bench trial in this breach-of-contract case, the court is called upon to put an end to an acrimonious employment relationship that began five and one-half years ago when the defendant purchased the plaintiff's step-father's business. The defendant terminated the plaintiff, purportedly because he was a "poison pill" to the morale of the defendant's workforce. The plaintiff, however, disputes this allegation and argues in this lawsuit that the defendant did not have cause to terminate him, and he seeks damages for the defendant's alleged breach of their employment contract.

## I. INTRODUCTION

Roger Lyons and his mother, Gretchen Eddy, initiated this lawsuit against Midwest Glazing, L.L.C., doing business as Eddy's Glass & Door, ("Midwest Glazing" and "Eddy's Glass & Door"), in Iowa District Court in and for Winnebago County on July 23, 2001. Midwest Glazing filed a notice of removal on August 21, 2001 and sought to remove the plaintiffs' lawsuit pursuant to 28 U.S.C. § 1441(b). Removal was proper under 28 U.S.C. § 1331 because, among other causes of action, the plaintiffs alleged violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201.[1] The plaintiffs also alleged breach of contract, abuse of process, and defamation, and they sought punitive and actual dam-

ages. On March 28, 2002, Midwest Glazing filed an amended and substituted answer in which it asserted counterclaims against Mr. Lyons for tortious interference and breach of fiduciary duty. The court had supplemental jurisdiction over the plaintiffs' and Midwest Glazing's state-law claims under 28 U.S.C. § 1367.

On November 4, 2002, Midwest Glazing moved for partial summary judgment on plaintiff Lyons's claims for abuse of process, defamation, and violation of the FMLA. Midwest Glazing also sought partial summary judgment on the issue of damages recoverable for breach of contract and on Mr. Lyons's claim for punitive damages. On December 18, 2002, this court granted Midwest Glazing's summary judgment motion on each ground raised by the defendant with the exception of Mr. Lyons's breach-of-contract claim.

On that claim, the court granted Midwest Glazing's summary judgment motion insofar as it argued Mr. Lyons was not entitled to recover emotional distress damages or punitive damages. Midwest Glazing also argued that Mr. Lyons was precluded from recovering any actual damages beyond the limited three-week period during which he was unemployed, because Mr. Lyons commands a higher annual salary at his new position than he did at Midwest Glazing. Mr. Lyons resisted this contention and argued that he should be allowed to recover the value to

---

**1.** The Supreme Court recently held, in *Breuer v. Jim's Concrete of Brevard, Inc.,* — U.S. ——, 123 S.Ct. 1882, 1883, 155 L.Ed.2d 923 (2003), that actions brought in state court alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 216(b), are properly removable to federal court.

him of his time because his new employer has more rigorous time demands and of his vacation time which he lost with his new employer. On these points, the parties did not cite to any controlling authority or on-point case-law, and the court opined that, failing any direction from the parties, the most prudent route would be to proceed to trial on that claim.

Moreover, Mr. Lyons accepted Midwest Glazing's offer of settlement on his FLSA claim, made pursuant to Federal Rule of Civil Procedure 68, on November 19, 2002, and the parties stipulated to the dismissal of Mrs. Eddy from this lawsuit on December 30, 2002. Thus, Mr. Lyons's breach-of-contract claim and Midwest Glazing's counter-claims against Mr. Lyons were the sole claims remaining to be tried.

Mr. Lyons had originally filed a demand for a jury trial but later waived a jury, and the parties announced their intention to try this matter to the court. The court held a one-day bench trial on April 23, 2003 in Fort Dodge, Iowa. At this trial, Mr. Lyons was represented by Randall E. Nielsen of Pappajohn, Shriver, Eide & Nicholas, P.C., Mason City, Iowa. Midwest Glazing was represented by Mark L. Zaiger of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, Iowa.

At the conclusion of the parties' well-prepared and efficient presentation of evidence, the parties and the court agreed to hold closing arguments telephonically on May 7, 2003. The court finds that this case is now ripe for disposition.

## II. FINDINGS OF FACT

### A. Applicable Standards

Following a bench trial, Federal Rule of Civil Procedure 52 directs a district court to articulate its findings of fact and conclusions of law: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its con-clusions of law thereon...." FED. R. CIV. P. 52(a). A court may then enter judgment FED. R. CIV. P. 58. In reviewing a district court's order entering judgment after a bench trial, the court of appeals reviews the district court's factual findings for clear error and reviews its legal conclusions de novo. FED. R. CIV. P. 52(a); *Speer v. City of Wynne, Ark.,* 276 F.3d 980, 984–85 (8th Cir.2002). "Under this standard, [the Eighth Circuit Court of Appeals] overturn[s] a factual finding only if it is not supported by substantial evidence in the record, if the finding is based on an erroneous view of the law, or if [the appellate court is] left with the definite and firm conviction that an error has been made." *Estate of Davis v. Delo,* 115 F.3d 1388, 1393–94 (8th Cir.1997). In addition, a reviewing court gives due regard to the opportunity of the district court to judge the credibility of the witnesses. *Id.;* FED. R. CIV. P. 52(a).

### B. Factual Findings

The parties do not dispute the large majority of factual matters underlying this case. Nonetheless, the court will not distinguish between the facts to which the parties have stipulated and the facts that require the court to resolve conflicting testimony. The court notes, however, that most of the conflicting testimony pertains to the fighting issue in this case—whether or not Midwest Glazing had cause to terminate Mr. Lyons's employment.

### 1. Eddy's Glass & Door: Then and now

Eddy's Glass & Door was formed by Douglas Eddy in Forest City, Iowa as a glazing and overhead door company. Mr. Lyons was Mr. Eddy's step-son, and he had begun intermittently working for Eddy's Glass & Door when he was in high school and began full-time employment

there in 1987. Mr. Lyons worked primarily in the company's overhead door department as a salesperson and installation technician.

When Mr. Eddy died on October 21, 1996, his will provided that the business be sold and made part of the estate. Mrs. Eddy, on behalf of the Estate of Douglas Eddy, sold Eddy's Glass & Door to Midwest Glazing on December 29, 1997. Mr. Lyons and another long-time employee of Eddy's Glass & Door, Kermith Balvance, were third-party beneficiaries of Mrs. Eddy's sale agreement with Midwest Glazing. Specifically, paragraph 7 of the sales agreement provided:

> Buyer [Midwest Glazing] agrees to offer employment to all employees currently employed by Eddy's Glass and Door as of said date of closing for a period of not less than six months from said date and further agrees to maintain the employment of key employees, namely: Kermith Balvance and Roger Lyons subject only to termination for cause on the part of said employees or voluntary resignation or termination at the option of said employees.

[Exh. MG1].

### 2. Managerial difficulties

Management difficulties were apparent from the outset of Midwest Glazing's purchase of Eddy's Glass & Door. Midwest Glazing's headquarters are located in Cedar Rapids, Iowa—approximately 165 miles from Eddy's Glass & Door in Forest City, Iowa. Because of the distance, strong local management was particularly important. After acquiring Eddy's Glass & Door in 1997, Midwest Glazing sought to fill the "branch manager" position at Eddy's Glass & Door. This position was salaried, and the person who filled it would

be responsible for overseeing the daily operations at Eddy's Glass & Door and would report to Jeff Driscoll, Midwest Glazing's Operations Manager, in Cedar Rapids.

Midwest Glazing first offered the branch manager position to Mr. Lyons, but he declined the invitation. Instead, Mr. Lyons assumed the newly-created Product Manager position, in which he managed the Eddy's Glass & Door's overhead door department. As the Product Manager, Mr. Lyons was also a salaried employee.

In its search for a branch manager, Midwest Glazing turned next to Mr. Balvance, who reluctantly accepted the position. In 1998, however, he asked to be replaced. At that time, Randy Taylor was hired from outside the company to lead Eddy's Glass & Door as branch manager. Mr. Taylor remained in this position for approximately one year but was ultimately terminated because Eddy's Glass & Door was not showing a profit and because, in Midwest Glazing's opinion, he did not command sufficient respect from his employees.

After Mr. Taylor left Eddy's Glass & Door in March of 2000, Mr. Balvance resumed the branch manager position. He conditioned his acceptance of Midwest Glazing's offer of the position on an understanding that he would not be responsible for Mr. Lyons's actions. Mr. Balvance expressed frustration with Mr. Lyons after he resigned as branch manager in 1998 because he felt powerless to control Mr. Lyons, especially in light of the fact that Mr. Lyons's mother, Mrs. Eddy, owned the apartment in which Mr. Balvance lived. Mr. Balvance felt that his duties as branch manager could threaten his housing situation in the event he was called upon to discipline Mr. Lyons,[2] which Mr. Balvance

---

2. In fact, Mr. Balvance's fears came to fruition when Mrs. Eddy evicted him after Mr. Lyons's employment for Eddy's Glass & Door was terminated. Mr. Balvance had lived in the apartment owned by Mrs. Eddy for twenty-four years.

thought was a probable eventuality because he believed Mr. Lyons was a problem employee.

On December 18, 2000, Mr. Balvance again voluntarily stepped down, and he was replaced by Julie Weide. Ms. Weide continued as branch manager until late 2002 or early 2003, when Mr. Balvance once again reluctantly resumed the principal leadership role at Eddy's Glass & Door as branch manager, a role which he continued to fill at the time of trial.

### 3. Poor morale

The leadership difficulties at Eddy's Glass & Door that necessitated five managerial changes in as many years were intimately tied to Mr. Lyons's attitude and morale deficiencies. According to Mr. Driscoll, the Midwest Glazing's Operations Manager, Mr. Lyons was a "bad apple" and a "poison pill" whose poor morale and refusal to accept Midwest Glazing's ownership of Eddy's Glass & Door infected all of Eddy's Glass & Door's employees. Mr. Driscoll had addressed these issues with Mr. Lyons on no fewer than three occasions.

Mr. Driscoll initially became aware of the problem with Mr. Lyons in early 1999 after the Human Resources Manager of Midwest Glazing, Connie Pegump, held a meeting with Eddy's Glass & Door employees in Forest City to discuss Midwest Glazing's new benefits policy. During the meeting, Mr. Lyons was disruptive, rolled his eyes, made complaints about his pay, undermined Mr. Taylor's leadership abilities by insulting his knowledge of the business, and expressed his disgust over Midwest Glazing's ownership of Eddy's Glass & Door. Ms. Pegump met in private with Mr. Lyons after the meeting to discuss his behavior. At this meeting, Mr. Lyons told Ms. Pegump that he and his mother would not have sold Eddy's Glass & Door if they had known Midwest Glazing would have

run it so poorly and that he thought Midwest Glazing only purchased the business as a "tax write-off."

Upon her return to corporate headquarters in Cedar Rapids, Ms. Pegump informed Mr. Driscoll that there were "real issues" at Eddy's Glass & Door and that Midwest Glazing had "trouble in Forest City," pointing to Mr. Lyons as the source of the trouble. As a result of Ms. Pegump's report, Mr. Driscoll set up a meeting between himself, Mr. Lyons, and Mr. Taylor at the Perkins restaurant in Clear Lake, Iowa in March of 1999. At this meeting, Mr. Driscoll addressed the concerns Mr. Lyons had voiced to Ms. Pegump. In addition, Mr. Driscoll discussed the company's paid time off ("PTO") policy and the work hours expected of salaried employees. Mr. Driscoll's goal in bringing Mr. Lyons and Mr. Taylor together was to reinforce Mr. Taylor's authority and to instruct Mr. Lyons that, as the Product Manager, his role was to support Mr. Taylor and not to undermine his authority among fellow employees because Mr. Lyons's attitude was contributing to a generalized morale problem at Eddy's Glass & Door.

Despite Mr. Driscoll's firm admonition to Mr. Lyons, the morale problems continued, and Midwest Glazing ultimately determined that Mr. Taylor's leadership skills were not strong enough to remedy them. As a result, Midwest Glazing discharged Mr. Taylor. From the testimony presented at trial, it was clear that Eddy's Glass & Door employees enjoyed very little job satisfaction, and Midwest Glazing largely attributed this to morale problems. Each of Midwest Glazing's decisions regarding the termination of Eddy's Glass & Door employees were aimed at ameliorating those problems, including Mr. Taylor's discharge.

After Mr. Balvance agreed to take the reigns of Eddy's Glass & Door again, in March of 2000, Mr. Driscoll made a visit to Forest City to discuss the managerial change with Eddy's Glass & Door employees. Mr. Driscoll addressed his concerns about morale and asked the employees to support Mr. Balvance in his position as branch manager. During this meeting, two employees, in particular, voiced concerns about Mr. Lyons's behavior. Therefore, Mr. Driscoll again met with Mr. Lyons.

In private, Mr. Driscoll, for the second time, reprimanded Mr. Lyons about his infectious poor morale. He also talked to Mr. Lyons about his abuse of the company's PTO policy, which will be discussed in greater detail below. After this meeting, Mr. Driscoll called Ms. Pegump in Cedar Rapids and asked her to document this conversation and to place the record in Mr. Lyons's personnel file.

Only three months after this meeting, in June of 2000, Mr. Driscoll was called upon once again to reprimand Mr. Lyons. Mr. Lyons had had a "blow up" with a coworker, Christy Meyers, because she had forgotten to bring a part to a job site on which Mr. Lyons and Doug Cronkwright, an employee in Mr. Lyons's overhead door department, were working. Mr. Driscoll had arrived in Forest City unannounced and went with Mr. Balvance to the job site to address the problem. On a dirt road near the job site, Mr. Driscoll repeatedly told Mr. Lyons that his behavior was unprofessional and that, if it continued, his employment would be terminated.

Mr. Lyons blames Mr. Balvance for the internal bickering and resulting morale problems at Eddy's Glass & Door. At trial, Mr. Lyons sought to paint Mr. Balvance as an "estranged uncle" vying for power of the family business. The court, however, was not persuaded by this depiction, not least because of Mr. Lyons's prior inconsistent deposition testimony in which Mr. Lyons testified that he had a good relationship with Mr. Balvance and because the record is devoid of any indication that Mr. Balvance sought control of Eddy's Glass & Door. Quite contrary to Mr. Lyons's depiction of him, the court finds that Mr. Balvance is a hard-working, loyal, and dedicated "company man" who would prefer not to have any managerial responsibilities at all and only reluctantly assumed them because of Eddy's Glass & Door's need for his services. Mr. Balvance did not feel wholly comfortable as Mr. Lyons's superior because of his living situation and because of the fact Mr. Lyons was Mr. Eddy's step-son. This discomfort oftentimes manifested itself as tension because Mr. Lyons felt that he owned the company and was unwilling to recognize Mr. Balvance's authority. At the same time, Mr. Balvance was uncomfortable enforcing the company's chain-of-command and disciplining Mr. Lyons for his behavior and attitude because of the relationship Mr. Balvance had had with Mr. Lyons's step-father, Mr. Eddy.

In any event, regardless of whether the tension between the plaintiff and Mr. Balvance was mutual, one thing was clear— Mr. Lyons was not willing to accept Midwest Glazing's management of his step-father's former business, and this denial resulted in morale problems because Mr. Lyons did not recognize Midwest Glazing's or Mr. Balvance's authority and encouraged his coworkers to mimic his behavior. For instance, Mr. Lyons was assembling and installing a garage door for one of his neighbors and acquired the parts to do so from Eddy's Glass & Door's damaged inventory. When Mr. Balvance questioned him about it, Mr. Lyons stated that Eddy's Glass & Door owed him because it did not pay him well enough. When Mr. Balvance suggested that those parts could be used to repair the shop's garage door, Mr.

Lyons responded that, if Midwest Glazing wanted to fix the door, the corporation could pay for it.

By way of further example of Mr. Lyons's contribution to the morale problems that permeated Eddy's Glass & Door, Mr. Lyons got into an argument with a coworker, Shannon Holland. Mr. Lyons was Mr. Holland's supervisor, yet he allowed their argument to escalate, and Mr. Lyons pushed Mr. Holland to the floor.

There is also ample evidence of Mr. Lyons's tendency to spread rumors, especially about Mr. Balvance. For example, Mr. Cronkwright testified that Mr. Lyons repeatedly told him that Mr. Balvance wanted to terminate him. Mr. Balvance denied these allegations. Another longtime Eddy's Glass & Door employee, Steve Rochleau, testified that, in one meeting in particular, Mr. Lyons was, in fact, the individual, not Mr. Balvance, who expressed a desire to terminate Mr. Cronkwright's employment.

Mr. Cronkwright and Mr. Rochleau each testified that Mr. Lyons was difficult to work with, that he did not respect authority, and that he used derogatory monikers to refer to coworkers, such as "little weasel," "idiot boy," "piece of sh*t," and "Dumbo." Mr. Rochleau testified that Mr. Lyons had no respect for Mr. Taylor and that he openly opined that Mr. Taylor was a failure as a manager. According to Mr. Rochleau, other employees, namely, Mr. Holland and Duane Finch, also complained about the difficulty of working with Mr. Lyons.

With respect to Mr. Cronkwright's employment working in Mr. Lyons's department, Mr. Lyons made it exceedingly difficult for Mr. Cronkwright to succeed as a salesperson. Specifically, Mr. Lyons belittled Mr. Cronkwright in front of customers and, according to Mr. Rochleau, made Mr. Cronkwright appear unintelligent. Mr. Cronkwright was an ambitious worker and

was eager to learn the business. However, he felt that Mr. Lyons's conduct precluded him from doing so. Mr. Cronkwright ultimately became so frustrated and "fed up" with Mr. Lyons's behavior that he called a meeting with Mr. Lyons, Mr. Balvance, and Mr. Rochleau to address it. At this meeting, Mr. Cronkwright aired his concerns about Mr. Lyons's conduct, but the situation did not improve. After some time, Mr. Cronkwright called another meeting to address the same problems and reiterated how unprofessional he thought Mr. Lyons's conduct was and that it had to stop.

In short, internal bickering and morale problems permeated Eddy's Glass & Door and detracted from the business's ability to move forward and to grow. Mr. Driscoll analogized the effect of morale problems on a business to cancer: morale problems spread and deteriorate everything from sales, to customer service, to profits. Based on his own observations, Ms. Pegump's experience with Mr. Lyons, and reports from Mr. Taylor, Mr. Balvance, and other Eddy's Glass & Door employees, Mr. Driscoll and Ms. Pegump, the Midwest Glazing employees responsible for making termination decisions, concluded that Mr. Lyons was the source of the morale problems at Eddy's Glass & Door, and, in the fall of 2000, they began contemplating his dismissal when they were alerted to possible abuses of the company's paid time off policy.

### 4. Paid time off

The defendant's testimony at trial notes that the "tip of the iceberg" with respect to terminating Mr. Lyons was his abuse of PTO. Upon learning that Mr. Lyons had abused the company's PTO policy in 2000, Mr. Driscoll and Ms. Pegump decided to terminate Mr. Lyons. In 1999, Midwest Glazing instituted a new PTO policy for

salaried employees, including Mr. Lyons. That policy allotted 160 hours of paid time off to salaried employees, and those 160 hours encompassed personal, vacation, and sick leave. As early as the latter part of 1998, Midwest Glazing was concerned about Mr. Lyons's potential abuse of his PTO. As a result, Mr. Taylor and Mr. Balvance tracked Mr. Lyons's PTO in 1999. Their records reflect that Mr. Lyons used 212 hours of PTO, despite the fact he is allowed only 160 hours. [Exh. MG5]. Midwest Glazing did not dock Mr. Lyons's pay for this 52–hour overage, nor did it discipline him, but Mr. Driscoll discussed the problem with Mr. Lyons in March of 2000.

Mr. Balvance continued to track Mr. Lyons's PTO in 2000. In September of that year, Mr. Balvance approached Mr. Lyons about his use of PTO because Mr. Lyons had already exhausted his allotted PTO, and Mr. Balvance knew that Mr. Lyons was planning a week-long trip to California in October, 2000. As of September 6, 2000, Midwest Glazing's records showed that Mr. Lyons had used 172.25 hours of his PTO—an overage of 12.25 hours with nearly four months of the year remaining.

After being given his 2000 PTO records, Mr. Lyons and his wife, Tammy Lyons, requested a meeting with Mr. Balvance. Mr. Balvance went to their home, and Mrs. Lyons told Mr. Balvance that Midwest Glazing's records were inaccurate because they did not reflect the extra hours Mr. Lyons worked to make up for some of the time he had taken off. Mr. Balvance agreed that Mr. Lyons should be credited with twenty-four hours for his time representing Eddy's Glass & Door at the annual Home Show. Even so, Mr. Balvance explained that Mr. Lyons's planned 7–day California trip would result in an overage

and that Mr. Lyons should contact corporate headquarters to determine what he should do. Notably, even though Mr. and Mrs. Lyons disputed the number of hours used in 2000 because of Mr. Lyons's purported extra work hours, even their revised version of Mr. Lyons's PTO records, which take his extra hours into account, indicates that Mr. Lyons's California trip would have resulted in an overage of his 160 hours of PTO. [Exh. MG7].

Despite never obtaining authorization or clearance from Mr. Balvance or any Midwest Glazing employee in Cedar Rapids, Mr. Lyons used an additional 64 hours of PTO after his meeting with Mr. Balvance in September of 2000—the equivalent of 8 days.[3] While there was some misunderstanding concerning whether Mr. Lyons should have contacted Mr. Balvance or Mr. Driscoll to address the overage problem, Mr. Lyons knew there was a PTO problem, and it is undisputed that he did not obtain clearance to take additional PTO time after being apprised of the overage in September of 2000.

In sum, in 2000, Mr. Lyons took 236.25 hours of paid time off, in spite of the company's allowance of 160 hours. [Exh. MG6]. Again, Mr. Lyons was paid for all of these hours and at no time offered to take any excessive leave without pay, which is permissible under Midwest Glazing's PTO policy when no PTO time is available. When Mr. Driscoll learned of Mr. Lyons's second consecutive year of excessive PTO usage, he and Ms. Pegump decided to terminate Mr. Lyons.

### 5. *Mr. Lyons's termination and subsequent employment*

On January 2, 2001, Mr. Driscoll met with Mr. Lyons and informed him that

---

**3.** Mr. Lyons's PTO records actually only reflect time off through October 6, 2000. The

court assumes Mr. Lyons did not take any additional time off after that date.

Midwest Glazing was terminating his employment. Mr. Lyons admits that, at this meeting, Mr. Driscoll told Mr. Lyons that he was being discharged because he had poor morale, was a "poison pill," and had abused the company's PTO policy. The court finds that these were Midwest Glazing's genuine reasons for terminating Mr. Lyons.

On January 30, 2001, Mr. Lyons was hired as the manager of Holland Contracting's fledgling overhead door division, Advanced Door Systems, in Forest City, Iowa. Mr. Lyons earns a higher annual salary at Holland Contracting than he did at Eddy's Glass & Door. He is an at will employee and also claims that he must work more hours because he has more rigorous time demands made on him than he did in his former position. He is also not entitled to as much PTO time at Holland Contracting as he was at Eddy's Glass & Door. Still, Mr. Lyons is excelling at his new position and admittedly has much greater job satisfaction at Holland Contracting.

Like Eddy's Glass & Door, Holland Contracting is a Raynor brand overhead garage door distributor. Prior to Mr. Lyons's termination, Eddy's Glass & Door was the only Raynor dealer in Forest City, and it is rare to have two distributors of the same product in a small town like Forest City. By all accounts, Mr. Lyons is a skilled salesperson and has a strong relationship with Raynor. During Mr. Lyons's tenure at Eddy's Glass & Door, Raynor expressed its support of Mr. Lyons, and Mr. Lyons was confident that if he were to be terminated or were to resign as the Product Manager at Eddy's Glass & Door, Raynor would follow him.

Raynor has not wholly abandoned its relationship with Eddy's Glass & Door, but Eddy's Glass & Door's Raynor business has suffered as a result of Mr. Lyons's departure. For example, at the annual

Home Show in Mason City, Iowa, a Raynor representative informed the facilities manager that Holland Contracting was its designated distributor. Because Home Show policy allowed only one distributor per brand, the facilities manager attempted to prevent Eddy's Glass & Door from setting up its Raynor booth. Eddy's Glass & Door was ultimately able to set up its Raynor exhibit but only as a result of Mr. Driscoll and Mr. Cronkwright's skillful maneuvering.

Furthermore, Winnebago Industries is home-based in Forest City, and, until the time of Mr. Lyons's departure, was one of Eddy's Glass & Door's best overhead door customers. Since Mr. Lyons's termination, Eddy's Glass & Door's revenues generated from business with Winnebago Industries have slumped significantly. Midwest Glazing attributes this slump to Mr. Lyons's interference with its business relationship with Winnebago Industries and, furthermore, believes that, once litigation in this matter has concluded, Raynor will dissolve its relationship with Midwest Glazing entirely so that Mr. Lyons at Holland Contracting will be the sole Raynor distributor in Forest City.

### III. CONCLUSIONS OF LAW

*(Including some additional findings of fact)*

#### A. Choice of Law

The court will begin its analysis of the merits of Mr. Lyons's breach-of-contract case and will then address Midwest Glazing's counter-claims against Mr. Lyons. However, as a preliminary matter, the court notes that Iowa law applies to the remaining claims of this lawsuit. This is so because these claims are in federal court based on the court's supplemental jurisdiction to the plaintiff's federal question claims, which are no longer at issue in

this lawsuit. The parties do not argue that anything other than Iowa law should apply, and, in their trial briefs, themselves applied Iowa law.

A federal court must apply the choice of law rules of the forum state in which it sits—in this case, Iowa. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Iowa law employs the Second Restatement's "most significant relationship" test. *See, e.g., Veasley v. CRST Internat'l, Inc.,* 553 N.W.2d 896, 897 (Iowa 1996) (recognizing Iowa's adoption of the "most significant relationship" test); *Cameron v. Hardisty,* 407 N.W.2d 595, 597 (Iowa 1987) (same); *Cole v. State Auto. & Cas. Underwriters,* 296 N.W.2d 779, 781–82 (Iowa 1980) (same); *Berghammer v. Smith,* 185 N.W.2d 226, 231 (Iowa 1971) (same). Here, the court finds that Iowa has the most significant relationship to the parties' disputes because the contractual relationships were formed in Iowa, Midwest Glazing and Mr. Lyons reside in Iowa, and all the underlying events of this lawsuit occurred in Iowa. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (absent choice by parties, court should consider place of contracting, of negotiation, of performance, of contract's subject matter, and parties' domiciles, residences, nationalities, places of incorporation, and places of business).

### B. Breach–of–Contract Claim

It is undisputed in this case that Mr. Lyons is a third-party beneficiary to the sales contract between Mrs. Eddy and Midwest Glazing. As the third-party beneficiary, Mr. Lyons is entitled to enforce paragraph 7 of the sales agreement insofar as it provides him with "for cause" job protection. *See Tredrea v. Anesthesia & Analgesia, P.C.,* 584 N.W.2d 276, 280, 281–82 (Iowa 1998) (third-party beneficiaries have standing to enforce provisions of con-

tract that are intended to benefit them). The pertinent portion of the sales agreement in this case provides that "Buyer [Midwest Glazing] agrees ... to maintain the employment of ... Roger Lyons subject only to termination for cause on the part of said employee[ ]...." [Exh. MG1]. Mr. Lyons alleges that Midwest Glazing did not have cause to terminate him and, therefore, that Midwest Glazing breached the sales agreement.

On a breach-of-contract claim, the plaintiff generally must prove the existence of the following elements:

(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch,* 497 N.W.2d 821, 825 (Iowa 1993)).

Here, the parties agree that Mr. Lyons has established the first three elements of his breach-of-contract claim: the existence of a contract, that the contract provides Mr. Lyons with "for cause" job protection, and that Mr. Lyons has performed his duties under the contract. Midwest Glazing disputes Mr. Lyons's allegation that it breached the contract in any way, because Midwest Glazing argues it had cause to terminate Mr. Lyons. Furthermore, Midwest Glazing contends that Mr. Lyons failed to establish that he suffered any damages, even assuming that Midwest Glazing did breach the sales agreement, because he earns a higher annual salary at Holland Contracting than he did at Eddy's Glass & Door. The court will turn first to

Mr. Lyons's claim that Midwest Glazing breached the contract.

### 1. Burden of proof

■ The parties agree that Midwest Glazing bears the burden of proving that it had cause to terminate Mr. Lyons. In a breach-of-contract case applying Iowa law, the Court of Appeals for the Eighth Circuit held:

> Ordinarily, a plaintiff claiming a breach of contract bears the burden of proving that he performed his obligations under the contract. *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). However, in a case arising under a "for cause" employment contract, it is generally held that the employer has the burden of proving cause for termination. *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1059 (Colo.1992).

*Ross v. Garner Printing Co.*, 285 F.3d 1106, 1113 (8th Cir.2002).

This court wholly agrees with the *Ross* court's interpretation of Iowa law and its reasoning. Therefore, the court concludes that Midwest Glazing must prove by the greater weight of the evidence that it had cause to terminate Mr. Lyons.

### 2. Did Midwest Glazing have cause for termination?

In closing arguments, counsel for the defendant frankly stated his opinion that this case turns on the court's credibility determinations because there is no dispute that the sales agreement affords Mr. Lyons "for cause" protection and because the parties agree on the legal definition of cause. Thus, the gravamen of this entire lawsuit is whether the court finds that cause existed, which necessarily requires the court to judge the witnesses' credibility.

The Iowa Supreme Court has recognized the impossibility of attaching a fixed meaning to "cause": "Probably no inflexible 'just cause' definition we could devise would be adequate to measure the myriad of situations which may surface in future litigation." *Briggs v. Board of Directors of Hinton Cmty. Sch. Dist.*, 282 N.W.2d 740, 743 (Iowa 1979); *see also Lockhart v. Cedar Rapids Cmty. Sch. Dist.*, 577 N.W.2d 845, 847 n. 1 (Iowa 1998) ("There is no all-encompassing definition of 'just cause.'"). However, the Iowa court has not left other courts and employers without any guidance as to its meaning. The Iowa Supreme Court provided a generalized definition in *Lockhart v. Cedar Rapids Community School District*, 577 N.W.2d 845 (Iowa 1998):

> This term does encompass ... reasons that relate to an employee's performance of his or her job and the impact of that performance on an employer's ability to attain its reasonable goals. *See [Briggs*, 282 N.W.2d at 743]; *Board of Dirs. v. Simons*, 493 N.W.2d 879, 884 (Iowa App.1992). "Just cause" also includes reasons based on an employer's legitimate budgetary or personnel requirements, unrelated to employee fault. *See Briggs*, 282 N.W.2d at 742; *Southeastern Community College v. Krieger*, 535 N.W.2d 140, 143 (Iowa App.1995). "Just cause" does not include "reasons which are arbitrary, unfair, or generated out of some petty vendetta." *Briggs*, 282 N.W.2d at 743.

*Lockhart*, 577 N.W.2d at 847 n. 1.

■ Here, the court found, in its findings of fact, that Midwest Glazing's reasons for dismissing Mr. Lyons were its bona fide reasons: Mr. Lyons had a negative attitude and poor morale, which infected other employees' attitudes and ultimately, harmed the business. In addition, Mr. Lyons had abused the company's PTO policy and, for two consecutive years, had taken more paid time off than provided

under the policy. The court now finds that each of these reasons is a legitimate reason for terminating Mr. Lyons.

Mr. Lyons was a talented salesperson and had good customer relations, as demonstrated by Winnebago Industries's choice to do business with him at Holland Contracting in lieu of remaining with Eddy's Glass & Door. Still, he was difficult to work with, undermined management's authority, did not respect Midwest Glazing's ownership and management, and abused the company's paid time off policy. By all accounts, the atmosphere among employees at Eddy's Glass & Door during Mr. Lyons's tenure there as a Midwest Glazing employee was, at best, tense. Mr. Lyons was a significant source of this tension, and it has eased since his departure. In short, Midwest Glazing's reasons for terminating Mr. Lyons were "real reasons" that "relate[d] to [Mr. Lyons's] performance of his ... job and the impact of that performance on [Midwest Glazing's] ability to attain its [reasonable goals]." *Lockhart*, 577 N.W.2d at 847 n. 1 (citations omitted). Therefore, Midwest Glazing had "cause" to terminate Mr. Lyons and, therefore, did not breach the provision of the sales agreement that affords Mr. Lyons "for cause" job protection.

The court doubts that Mr. Lyons can prove the fifth element of his breach-of-contract claim, *i.e.*, damages, but because the court has concluded that Mr. Lyons's claim fails on the issue of whether Midwest Glazing had cause to discharge him, the court will not consider further his novel arguments that he is entitled to recover the value of his sense of job security under a "for cause" employment contract and of

his additional work hours at Holland Contracting. Therefore, because Midwest Glazing proved by the greater weight of the evidence that it had cause to terminate Mr. Lyons, the court finds in Midwest Glazing's favor on the plaintiff's breach-of-contract claim and will turn next to Midwest Glazing's counter-claims.

### C. *Midwest Glazing's Counter–Claims*

■ In Midwest Glazing's amended answer (Doc. No. 14), Midwest Glazing asserted two counter-claims against Mr. Lyons: tortious interference and breach of fiduciary duty. This was the defendant's first and last mention of those counter-claims.[4] The defendant did not raise them in the Final Pre-trial Order (Doc. No. 48), and the court, therefore, deems them waived. *See Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.),* 262 F.3d 725, 729 (8th Cir.2001) ("[A] party may be barred from advancing theories that are not identified in the pretrial order."); FED. R. CIV. P. 16(e) ("After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice."). Because evidence at trial on the counter-claims, such as Mr. Lyons's relationship with Raynor and Winnebago Industries, was also relevant to whether Midwest Glazing had cause to terminate Mr. Lyons, a post-trial amendment to conform to the proof pursuant to Federal Rule of Procedure 15(b) does not serve to re-inject the defendant's counter-claims into this lawsuit. *Gallon v. Lloyd–Thomas*

---

4. The parties planned on trying this case to a jury until shortly before the plaintiff waived his right to a jury trial, and they opted for a bench trial. Because the defendant had prepared proposed jury instructions, Midwest Glazing's counsel provided the court with a courtesy copy, even though the proposed instructions were not filed. The court's only indication of the basis of Midwest Glazing's counter-claims is contained within these proposed jury instructions and they are, at best, vague.

*Co.*, 264 F.2d 821, 823 (8th Cir.1959). Nevertheless, even assuming the defendant did not waive its counter-claims, the court finds that these claims fail on the merits.

### 1. Tortious interference

 Under Iowa law, the elements of tortious interference are:

1. The existence of a valid contractual relation;

2. Knowledge of the relationship;

3. Intentional interference inducing or causing a breach or termination of the relationship; and

4. Resultant damage to the party whose relation has been disrupted.

*Hibbs v. K–Mart Corp.*, 870 F.2d 435, 439–40 (8th Cir.1989) (citing *C.F. Sales, Inc. v. Amfert, Inc.*, 344 N.W.2d 543, 555 (Iowa 1983)) (quoting *Stoller Fisheries, Inc. v. American Title Insurance Co.*, 258 N.W.2d 336, 340 (Iowa 1977)); *accord Westway Trading Corp. v. River Terminal Corp.*, 314 N.W.2d 398, 402–03 (Iowa 1982) (listing same elements). The Court of Appeals for the Eighth Circuit has opined that Iowa courts may require a plaintiff also to prove that the alleged acts of interference were improper. *Hibbs*, 870 F.2d at 440 (citing *Wolfe v. Graether*, 389 N.W.2d 643, 659–60 (Iowa 1986)).

 Here, there is no evidence that Mr. Lyons interfered with any of Midwest Glazing's existing contractual relationships. Midwest Glazing did not have an agreement with Raynor to be the exclusive distributorship in Forest City, nor did Midwest Glazing have an agreement with Winnebago Industries to be the only service provider for that company's overhead doors. Moreover, Raynor and Winnebago Industries have not breached or terminated their dealings with Eddy's Glass & Door. Eddy's Glass & Door's business with these companies is weak, but it does exist. With respect to the All Tire job that Mr.

Lyons performed after he was terminated, Mr. Cronkwright testified that Eddy's Glass & Door never placed a bid on that job, and, therefore, there was no contractual or business relationship with which to interfere.

Midwest Glazing has undoubtedly lost overhead door business since Mr. Lyons's dismissal, but the defendant cannot be surprised that some customers felt loyal to the person with whom they had dealt for years and not to the company that employed him. Thus, Midwest Glazing's tortious interference claim also fails on causation because the record is devoid of proof that Mr. Lyons caused Midwest Glazing's business relationships with Raynor, Winnebago Industries, and All Tire to falter. The court, therefore, finds in favor of Mr. Lyons on Midwest Glazing's tortious interference claim.

### 2. Breach of fiduciary duty

Midwest Glazing also claims that Mr. Lyons breached a fiduciary duty to Midwest Glazing by: (1) threatening to interfere with relationships that Midwest Glazing had with outside vendors, distributors, and customers; and (2) taking customer information, materials, samples, and brochures and incorporating them as his own.

 The Iowa Supreme Court has defined a fiduciary duty as follows: "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) (citing RESTATEMENT (SECOND) OF TORTS § 874 cmt. a (1979)); *accord Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 294 (Iowa 2001) ("A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of

the relationship.") (citing RESTATEMENT (SECOND) OF TORTS § 874 cmt. a, at 300 (1979)). "Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another." *Irons v. Community State Bank*, 461 N.W.2d 849, 852 (Iowa Ct.App.1990). A fiduciary duty arises, for example, between attorneys and clients, guardians and wards, and principals and agents. *Oeltjenbrun v. CSA Investors, Inc.*, 3 F.Supp.2d 1024, 1053 (N.D.Iowa 1998); *Kurth*, 380 N.W.2d at 698; *accord Economy Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 647–48 (Iowa 1995) ("A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other."); *Engstrand v. West Des Moines State Bank*, 516 N.W.2d 797, 799 (Iowa 1994) (citing *Kurth*). As the Product Manager, hired to cultivate business relationships on the part of Eddy's Glass & Door, the court assumes that Mr. Lyons had a fiduciary relationship with Midwest Glazing.

To prevail on a claim for breach of that duty, Midwest Glazing must also prove that harm resulted from a breach of the fiduciary duty. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 874. In other words, Midwest Glazing must prove duty, breach, causation, and damages. As to Midwest Glazing's first allegation—that Mr. Lyons breached a duty when he threatened to interfere with relationships that Midwest Glazing had with outside vendors, distributors, and customers—the court finds that Midwest Glazing made no showing that Mr. Lyons threatened to interfere with any distribu-

tors or customers, nor that he in fact did interfere with any distributors or customers. The only testimony on this issue presented at trial was that Mr. Lyons stated, "If I go, Raynor goes." The court, however, does not find that Mr. Lyons had discussions or negotiations with Raynor to that effect. These statements, if they indeed were uttered, were idle threats, which simply do not rise to the level of breach.

Moreover, there was no evidence that Mr. Lyons persuaded Raynor to establish a competing distributorship at Holland Contracting. Instead, the only showing, which does not support a finding of breach or of causation, was that Raynor was so pleased with Mr. Lyons's representation of their product that they chose to set up a distributorship at his new place of employment.

Regarding Midwest Glazing's second allegation—that Mr. Lyons breached his fiduciary duty when he took customer information, materials, samples, and brochures and incorporated them as his own—the court finds that Midwest Glazing failed to establish that Mr. Lyons improperly took any such items. First, it is a close call, but the court finds that Mr. Lyons obtained Mr. Balvance's permission to take the brochures and product samples that are the subject of this claim. Specifically, shortly after Mr. Lyons was terminated, he returned to Eddy's Glass & Door and, in a rush, asked Mr. Balvance whether he could take several pamphlets and glass samples. Perhaps Mr. Balvance did not fully understand Mr. Lyons's request because Mr. Lyons was in a rush and because he only shouted the request from the showroom floor, while Mr. Balvance was in his office, but the court finds that Mr. Balvance responded to Mr. Lyons's request in the affirmative. Furthermore, at the time these items were taken, Mr.

Lyons no longer owed Midwest Glazing a fiduciary duty.

Second, there was evidence that Mr. Lyons used damaged inventory from Eddy's Glass & Door to install a garage door for his neighbor. However, Midwest Glazing did not show that it would have used that door. Mr. Balvance testified that Midwest Glazing "might" have been able to use the discarded door panels that Mr. Lyons took. Further, there was no evidence that Midwest Glazing ever repaired the damaged door at Eddy's Glass & Door's shop, nor that Midwest Glazing ever intended to fix it.

Third, like the door Mr. Lyons installed for his neighbor, the court finds there was no evidence to suggest that Mr. Lyons's performance of the All Tire job caused any damage to Eddy's Glass & Door because it is undisputed that Eddy's Glass & Door did not submit a bid on that job. Further, there was no evidence that any Eddy's Glass & Door employees intended to place a bid on that job. While it is likely Mr. Lyons would have done so had he remained the Product Manager, Midwest Glazing discharged him and subsequently had two weeks to submit an estimate to All Tire but failed to do so. Thus, because Midwest Glazing did not show that it ever intended to do the All Tire job, the court finds Midwest Glazing has not shown that it was harmed by Mr. Lyons's execution of the job.

Finally, Midwest Glazing presented evidence that Mr. Lyons was given a Midland brand garage door opener to display at Eddy's Glass & Door. Mr. Lyons does not dispute that the Midland opener is installed in his home's garage. However, he testified that a Midland vendor gave the opener to him personally, and not to use as a display. While this credibility determination presents a close call, the court finds Mr. Lyons's testimony on this issue credible and finds that the Midland opener was given to Mr. Lyons personally, and not to Eddy's Glass & Door. Therefore, installing it in his home was not a breach of his fiduciary duty.

In sum, because Midwest Glazing failed to establish the essential elements of its breach of fiduciary duty claim, the court finds in favor of Mr. Lyons as to this count of the defendant's counter-claim.

## IV. CONCLUSION

Because the court finds that Midwest Glazing proved that it had cause to terminate Mr. Lyons's employment, the court in this non-jury trial finds in favor of Midwest Glazing on the plaintiff's breach-of-contract claim.

The court further finds that, by failing to identify its counter-claims in the Final Pretrial Order, Midwest Glazing waived its claims against Mr. Lyons. However, even assuming that the claims were not waived, Midwest Glazing failed to establish any interference with its business relationships, nor did it show that Mr. Lyons breached his fiduciary duty to Midwest Glazing. Therefore, even in the absence of waiver, the court would find in favor of Mr. Lyons on the defendant's counter-claims of tortious interference and breach of fiduciary duty.

THEREFORE, the clerk of court is directed to close this case in its entirety, with neither the plaintiff nor the defendant recovering anything.

**IT IS SO ORDERED.**