Cite as 2020 Ark. App. 216

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV-18-155

| | |
|---|---|
| EVERETT LATHAM HAYES<br>APPELLLANT | **OPINION DELIVERED:** APRIL 8, 2020 |
| V. | APPEAL FROM THE NEWTON COUNTY CIRCUIT COURT [NO. 51CV-09-25] |
| ROBERT PSENKA; JEFF RODD; OZARK ENCLAVE PROPERTIES; J & J DEVELOPMENT, INC.; PAUL JEFFREY RODD, TRUSTEE OF THE PAUL JEFFREY RODD TRUST; AND THE PAUL JEFFREY RODD TRUST<br>APPELLEES | HONORABLE MARK HEWETT, JUDGE<br><br>AFFIRMED |

## ROBERT J. GLADWIN, Judge

Robert Psenka, Jeff Rodd, Ozark Enclave Properties, J and J Development, Inc. (collectively "Ozark Enclave"), and Paul Jeffrey Rodd, trustee of the Paul Jeffrey Rodd Trust ("Rodd Trust"), cross-appeal the Newton County Circuit Court's September 22, 2017 final judgment. Cross-appellants argue two points on appeal: (1) the circuit court's order granting foreclosure in favor of cross-appellee Hayes Family Trust ("HFT") and denying cross-appellants' claims for breach of contract and quiet title was clearly erroneous; and (2) the circuit court erred by denying cross-appellants' claim for tortious interference against appellant Everett Latham Hayes ("Everett").[1]

---

[1]Everett filed a notice of appeal on November 22, 2017, from the October 27, 2017 order denying his motion for judgment notwithstanding the verdict (JNOV) as well as from the final judgment filed September 22. The record was lodged with this court on February 20, 2018, and after several extensions were granted, Everett's appellate brief was due on July 8. However, Everett did not submit an appellate brief. Cross-appellants filed a notice of Everett's bankruptcy, and this court issued a stay of appeal on September 19. On May 8,

I. *Facts*

On September 27, 1996, HFT sold Shiloh Ranch ("Shiloh") to E. Wade Griffin, Allan W. Sanders, Arthur D. Evans, and Brenda K. Evans (collectively "Evans Group"). Shiloh is 720 acres in Newton County, Arkansas, and Evans Group obtained a mortgage on the property in the amount of $132,500 in favor of HFT.

In July 1999, Evans Group sold Shiloh to the Rodd Trust in exchange for a promissory note in the amount of $122,000. Evans Group also signed a warranty deed granting Shiloh to the Rodd Trust "[s]ubject to the existing mortgage dated September 27, 1996[.]" Even though the Rodd Trust did not assume any obligations to pay the mortgage signed by Evans Group, cross–appellants made payments on the mortgage.[2] When cross-appellants fell behind in payments to HFT, Herman Grover Hayes ("Grover"), the trustee of HFT, sent his son, Everett, to collect from Robert Psenka, who lived in the house on Shiloh.[3]

Soon thereafter, Psenka and Everett developed a scheme to market and sell ten acres of property owned by Everett. They referred to the property development as Angel Point, and Psenka and Jeff Rodd, doing business as Ozark Enclave Properties, and Everett signed a "Contract for Development of Real Property Newton County Arkansas" that includes an anticipated sales price of $2,950,000, a profit for Everett of $900,000, and a profit for Ozark

2019, cross-appellants filed a "motion to dismiss direct appeal and affirm," and we granted the motion on May 29. Accordingly, only the issues on cross-appeal are addressed herein.

[2]Robert Psenka and Jeff Rodd signed an agreement in July 1999 that together they would purchase and develop Shiloh into a wilderness camp.

[3]No payments have been made on the Shiloh mortgage since 2004.

Enclave of $950,000. Angel Point was auctioned at the Kruse Auction Company in St. Petersburg, Florida, on April 7, 2005, and a bid of $2,200,000 was accepted by Psenka and Everett.[4] However, the sale was never completed.

On April 14, 2009, cross-appellants filed a complaint against HFT, its trustees, and its beneficiaries and alleged breach of contract, tortious interference, and quiet title. Cross-appellants claimed that HFT had breached an oral agreement that cross-appellants could discharge their debt on Shiloh with the profit from Angel Point. They argued that Everett, acting on behalf of HFT, had breached the agreement when he failed to cooperate with the Angel Point sale. They also claimed breach of the agreement to develop and sell Angel Point. Further, they alleged tortious interference with their business expectancies related to Angel Point, and they sought quiet title to Shiloh. HFT filed a counterclaim against the Rodd Trust for the mortgage debt on Shiloh.

A hearing was held on May 16, 2011, and Lacy Shay Keenan testified that she had been married to Everett during the relevant time period. She said that the family involved in HFT determined that Everett would be in charge of collecting the money owed on Shiloh. She described her demand for payment from Psenka and Psenka's explanation that he had "other projects" and that if he were given time, he could "come up with the funds." She said that the next day, Everett's father said to Psenka while on speaker phone, "This is Grover Hayes and my son, Everett Hayes there, is going to handle this matter for me and please deal with him on it from here on out." Lacy said that the conversation between

---

[4]Both Psenka and Everett testified that they understood that a bid of $2.2 million was offered and that they left the auction believing that Angel Point had sold for that amount. The circuit court found that an offer and acceptance was made.

3

Everett and Psenka continued all afternoon and that Everett had bragged about his own thirty-three-acre property. She said that after they viewed Everett's property, ten acres of which were later referred to as Angel Point, Psenka said that with his connections, the land could be developed and that they could all make money. She said the idea was that Psenka could pay HFT for Shiloh and that Everett would "get money from both ends." She said that they collaborated on the project, came up with a name, and eventually went to the auction in Florida. She described that when the bidding for Angel Point reached $2.2 million, the auctioneer came to their table and asked, "Will you take 2.2?" Everett said, "Yeah, we'll take 2.2." She said that the auctioneer went back up, said "2.2" another two times, then said, "Sold for 2.2."

Psenka testified that he and Rodd had been business-venture partners since 1997 and that they had contracted to buy Shiloh. He said that when they began having trouble paying HFT, he contacted Grover to negotiate payment; however, Grover refused to negotiate. He described Lacy's demand for payment and his later meeting with Everett. He told of the plan for Everett's ten acres and about the development and auction of Angel Point. He said that Everett's father had told him in a telephone conversation that "Everett was to act on behalf of [HFT] and be in charge of the [Shiloh] note business." He said that there was no question in his mind that he was supposed to deal with Everett on behalf of HFT about the Shiloh note. He said that he had drafted the agreement to develop Angel Point and that he and Everett signed it. He said, "I had an agreement with Everett that part of the projected profits would go to pay off the [Shiloh] note to [HFT]."

Psenka testified about costs and expenses associated with Angel Point, and he said that he had expected Everett to repay him the total of $9,369. He also testified regarding

4

the auction of Angel Point and Everett's acceptance of $2.2 million. He said, "At the time we left the auction, I knew that someone had bid $2.2 million, but I did not know who." He said that after they returned to Arkansas, Everett and Lacy broke up and that Everett backed out of the deal to prevent Lacy from benefiting from it. He said on cross-examination, "We did not get far enough to have a written purchase offer for $2.2 million." He stated that HFT's benefit from the Angel Point project was that it would be paid its mortgage on Shiloh.

Everett testified that Psenka never talked to him about getting relief on the Shiloh mortgage. He said that they had discussed Angel Point and that he went to the Florida auction. He said that he told the auctioneer that he would take $2.2 million. He denied that his father put him in charge of HFT. He said that Angel Point was his and that his father had nothing to do with it. He said that Psenka may have told him that he planned to use his profit to pay the mortgage on Shiloh, and he said that he did not care how Psenka used his money. He denied backing out of the Angel Point contract, and he said that he never heard from any buyers. He also said that he told Psenka in late April 2005 that he was backing out of the deal.

On August 26, 2011, the circuit court issued a letter ruling and found that the contract regarding Angel Point is between cross-appellants and Everett only, not HFT; that an offer of $2.2 million was made and accepted by the parties to the contract; that the sale was never finalized due to Everett's failure to cooperate; and that Everett is in breach of the contract. However, the circuit court asked for "further clarification from the attorneys as to the amount of fees, if any that were paid by [cross-appellants] and the amount of construction cost that would have been allocated to [Ozark] Enclave for its work if it had

been performed. This clarification will be necessary before an Order can be entered." Also, the circuit court denied "any claim under a tort theory." The circuit court found the Shiloh mortgage in default with a combined principal and interest balance as of the date of trial in the amount of $91,824.79. HFT was granted foreclosure subject to cross-appellants' opportunity to pay the balance "within thirty days of the date the order is filed." The circuit court found that no agreement exists that would defer foreclosure on Shiloh while Angel Point was being marketed and developed and that there was no proof of an agreement to that effect that binds HFT.

A hearing was held in May 2012, and the circuit court discussed a supplemental order it had prepared—but not filed—and in which the circuit court found that Everett's breach of contract resulted in an award to cross-appellants in the amount of $550,000. HFT's attorney was to prepare the foreclosure portion of the final order, and cross-appellants' attorney was to prepare the breach-of-contract portion, and the orders were to be merged into a final order that would be presented to the circuit court. However, no order was filed, and after nearly six years, on May 25, 2017, Everett filed a motion to dismiss under Rule 41(b) of the Arkansas Rules of Civil Procedure. The motion was denied by order filed September 18, 2017.

A final judgment was filed on September 22, 2017, and the circuit court found that cross-appellants proved damages on their breach-of-contract claim against Everett in the amount of $550,000; that there is no contract between cross-appellants and HFT to use profits from the Angel Point sale to repay the mortgage on Shiloh; that cross-appellants did not prove any tort claim against any named defendants; that foreclosure is granted to HFT

on the Shiloh mortgage; and that the Rodd Trust is granted the right of redemption for thirty days from the entry of final judgment.

Everett filed a motion for JNOV on October 2, 2017, and the motion was denied by order filed October 27, 2017. Everett filed a timely notice of appeal, and cross-appellants filed a timely notice of cross-appeal. Because Everett's appeal has been dismissed and affirmed, this cross-appeal followed.

## II. *Standard of Review*

The standard of review in a bench trial is whether the circuit court's findings are clearly erroneous. *Barrett v. Thurston*, 2020 Ark. 36, 593 S.W.3d 1. A finding is clearly erroneous when, although there is evidence to support it, a reviewing court is left with a firm conviction that a mistake has been committed. *Id.*

## III. *Claims Against HFT*

Cross-appellants argue that the circuit court erroneously denied their claims for breach of contract and quiet title. They claim that the core issue is whether they had a valid, enforceable oral contract with HFT to use their profits from the Angel Point sale to offset the Shiloh mortgage, thereby receiving Shiloh free and clear of encumbrances of the mortgage held by HFT. Cross-appellants contend that the circuit court erred when it found that they failed to establish an enforceable agreement with HFT.

Cross-appellants set forth the facts as established above, relying heavily on trial testimony and claiming that they established Everett's agency for HFT. They point to testimony from Lacy, Psenka, and Everett and contend that the purpose of developing and selling Angel Point was to raise money for cross-appellants to use its profits to pay off the mortgage on Shiloh. They argue that this was the oral contract between them and HFT as

7

represented by its agent, Everett.  They point to Psenka's testimony and rely on his belief that Everett was the agent for HFT.

Cross-appellants argue that this oral contract is recognized by Arkansas law.  *See Ward v. Williams*, 354 Ark. 168, 118 S.W.3d 513 (2003); *Williamson v. Sanoft Winthrop Pharm., Inc.*, 347 Ark. 89, 60 S.W.3d 428 (2001); *Found. Telecomms. v. Moe Studio*, 341 Ark. 231, 16 S.W.3d 531 (2000).  The essential elements of a contract are as follows: (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations.  *Ward*, *supra*; *Williamson*, *supra*.

In *Courtyard Gardens Health and Rehabilitation, LLC v. Quarles*, 2013 Ark. 228, at 6–7, 428 S.W.3d 432, at 442–43, the Arkansas Supreme Court stated:

> We have adopted the definition of agency contained in the Second Restatement of the Law of Agency, § 1, comment a, which provides that the relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control. *Crouch v. Twin City Transit*, 245 Ark. 778, 434 S.W.2d 816 (1968). The two essential elements of the definition are authorization and right to control.

(citing *Evans v. White*, 284 Ark. 376, 378, 682 S.W.2d 733, 734 (1985)).

Cross-appellants point to *Foundation Telecommunications*, *supra*, as instructive. Therein, the pertinent issue was whether the circuit court erred in holding that an employee of Foundation had apparent authority to bind the corporation or to enter into a contract with Moe Studio on behalf of the corporation.  *Found. Telecomms.*, 341 Ark. at 238, 16 S.W.3d at 536.  The Arkansas Supreme Court stated,

> Apparent authority of an agent is such authority as the principal knowingly permits the agent to assume, or that he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority that he has; or such authority as a reasonably prudent man, using diligence and discretion, in view of the

principal's conduct, would naturally suppose the agent to possess. *General Motors Acc. Corp. v. Salter*, 172 Ark. 691, 290 S.W. 584 (1927). The principal is bound by all the acts of his agent coming within the apparent scope of the authority conferred upon him. *Crossett Lumber Co. v. Fowler*, 137 Ark. 418, 208 S.W. 786 (1919). Every delegation of authority, whether it be general or special, express or implied, unless its extent be otherwise expressly limited by the same instrument conferring it, carries with it as an incident, the power to do all those things that are necessary, proper, usual, and reasonable to be done in order to effectuate the purpose for which it was created. *Brown v. Brown*, 96 Ark. 456, 132 S.W. 220 (1910). When the evidence as to the nature and extent of an agent's authority is in conflict, it is a question of fact for the fact-finder. *Southland Mobile Home Corp. v. Chyrchel*, 255 Ark. 366, 500 S.W.2d 778 (1973). An agency can be established by circumstances, and any evidence tending to establish agency is admissible. *Id.*

*Id.* at 239, 16 S.W.3d at 536–37. The supreme court upheld the lower court's finding that the employee acted as an agent and that a valid oral contract had been formed based on the facts that Moe Studio employees met with employees of Foundation and worked according to a specific employee's direction, completing 95 percent of the project over a month's time. *See id.* at 239–40, 16 S.W.3d at 537.

Cross-appellants contend that the circumstances herein mirror those in *Foundation Telecommunications*. They argue that Everett was identified by Grover, the trustee of HFT, as the person on whom Psenka could rely in working out a way to pay the Shiloh mortgage, and Everett proceeded to act under apparent authority. They also argue that all the proper elements of a contract were met. They rely on Everett's agency status to fulfill the requirement of "competent parties." They argue that Everett agreed to the oral contract in his capacity as agent for HFT. They contend that Everett also contracted with cross-appellants to develop and sell Angel Point in order to create profits to pay the Shiloh mortgage.

We hold that the circuit court correctly ruled that HFT was not a party to the Angel Point development contract nor a party to the oral Shiloh mortgage-payment agreement.

9

Cross-appellants bore the burden of proving that Everett was the agent of HFT. *Taylor v. Gill*, 326 Ark 1040, 934 S.W.2d 919 (1996). Everett's former wife testified that Grover put Everett in charge of collecting the mortgage at a "family meeting." Other testimony refuted that the meeting took place and that Grover put Everett in charge. As argued by HFT, the evidence presented merely proved that Everett was his father's messenger in regard to collecting the mortgage payments on Shiloh. There was no evidence that Everett's father gave him the power to contract on behalf of HFT to sell Angel Point, a property solely owned by Everett. Because Everett was not an agent for HFT, the elements of a contract were not met.

Accordingly, the circuit court's decision that cross-appellants failed to prove a binding contract with HFT is not clearly erroneous, and the foreclosure is affirmed.

IV. *Claim Against Everett Hayes, Individually*

Cross-appellants contend that if they are not successful in reversing on the first point, then they should be entitled to judgment against Everett for tortious interference with business expectations, and they argue that the circuit court erroneously failed to find for them on this issue. They claim that Everett knew that cross-appellants had an expectation of obtaining Shiloh "free and clear" of the mortgage by using the profit from Angel Point to pay it.

The elements of tortious interference are

(1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Baptist Health v. Murphy*, 2010 Ark. 358, at 15, 373 S.W.3d 269, 281.  Cross-appellants contend that Everett met all the elements of tortious interference and that he acted willfully and maliciously to injure them.  They contend that their damages for this claim are $1,000 an acre for the 720 acres of Shiloh.

Facts in dispute and determinations of credibility are solely within the province of the fact-finder. *Id.* at 14–15, 373 S.W.3d at 281.  The testimony regarding the agreement between Everett and Psenka was contradictory.  The contract to develop Angel Point, which was drafted by Psenka and signed by Everett and cross-appellants, contains no language regarding the use of profit from the Angel Point sale to pay for the mortgage on Shiloh.  As established above, Everett was not an agent for HFT, and HFT was not a party to the development contract nor an owner of the property to be developed as Angel Point.  Accordingly, we are not left with a firm conviction that a mistake has been committed by the circuit court in denying cross-appellants' claim for tortious interference.

Affirmed.

SWITZER and MURPHY, JJ., agree.

*Davis Law Firm*, by: *Steven B. Davis*, for appellant/cross-appellee.

*Larry W. Burks, PLLC*, by: *Larry W. Burks*, for appellees/cross-appellants.